**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| **MICHAEL RAY HANLINE,** | ) |
|      **Petitioner,** | ) **Case No. EDCV 00-530-VAP(AJW)** |
|     **v.** | ) **REPORT AND RECOMMENDATION** |
| | ) **OF MAGISTRATE JUDGE** |
| **GEORGE GALAZA, WARDEN, and** | ) |
| **ATTORNEY GENERAL OF THE STATE** | ) |
| **OF CALIFORNIA,** | ) |
| | ) |
|     **Respondents.** | ) |

> "That flag flying over the courthouse
> Means certain things are set in stone:
> Who we are, what we'll do, and what we won't."
>
> —Bruce Springsteen, "Long Walk Home"

Petitioner was charged with murdering J.T. McGarry. For thirty years, evidence material to determining whether petitioner committed the crime remained sealed in the Ventura County Superior Court. Those documents reveal that – in violation of court orders to disclose it to the defense – the prosecution intentionally suppressed evidence that the prosecutor, the police, and more than one trial court judge all had agreed was material to the defense. In the decades following his conviction, petitioner filed several habeas petitions in the California

1  courts and one habeas petition in this Court.  Although – based upon

2  his awareness of secret proceedings in the trial court from which he

3  and his attorney were excluded – petitioner repeatedly sought the

4  information he suspected had been withheld from him, he was unable to

5  discover the factual basis for his clearly meritorious <u>Brady</u>[1] claim

6  until, at the request of petitioner's current counsel, the Innocence

7  Project, this Court ordered those documents unsealed.

8      In this, his second petition filed in this Court,[2] petitioner

9  alleges that the prosecution failed to reveal potentially exculpatory

10 information in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

11 [Petition at 7; Memorandum in Support of Petition at 46-50].  For the

12 following reasons, petitioner is entitled to relief.[3]

13                              **Background**

14     In 1978, J.T. McGarry was murdered.  Two weeks after his body was

15 discovered, "A,"[4] a confidential informant who also was J.T.'s former

16

17      [1]  <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

18      [2]  A petitioner may not file a second or successive petition
   in this court without obtaining prior permission from a three-judge
19 panel of the Ninth Circuit Court of Appeals.  <u>Felker v. Turpin</u>, 518
   U.S. 651, 657 (1996).  Petitioner, of course, did obtain permission
20 from the Ninth Circuit to file this petition. [November 23, 2004
   Order in Ninth Circuit Case No. 04-7354728].  The Ninth Circuit's
21 authorization is a <u>prima</u> <u>facie</u> determination that the petition
   meets the requirements of Section 2244(b).  <u>Nevius v. McDaniel</u>, 218
22 F.3d 940, 943-944 (9th Cir. 2000).

23      [3]  Petitioner originally alleged five claims for relief.  He
   subsequently withdrew all but his <u>Brady</u> claim and a claim of
24 ineffective assistance of counsel. [Reporter's Transcript of
   Closing Argument on July 29, 2009 at 3-5].  Because petitioner is
25 entitled to relief on the basis of his <u>Brady</u> claim, the Court need
   not address his ineffective assistance of counsel claim.
26

27      [4]  As discussed in more detail below, some of the relevant
   information was sealed by the trial court.  Pursuant to a
28 stipulation, and in order to protect certain witnesses, a
   protective order was issued.  In accordance with that order, the

employer, called Deputy Sheriff Marlin Smith and told him that he had information about J.T.'s murder.  "A" said that he had received a phone call from J.T.'s former girlfriend, Mary Bischoff, at 1:00 a.m. that same day.  "A" reported that during that phone call, Bischoff told "A" that she was at Los Angeles International Airport and that she was troubled by J.T.'s murder.  Bischoff said that she was in a love triangle with J.T. and petitioner, and then recounted details about J.T.'s abduction and murder.  Specifically, Bischoff allegedly told "A" that petitioner and Bo Messer went to J.T.'s home in a stolen silver van, used a ruse to get J.T. to open the door, taped his hands with surgical tape, put him in the van, and shot him.  Then they dumped his body along the freeway.  According to "A," Bischoff said that when they shot J.T., blood splattered all over the van, including the steering wheel, and on petitioner's clothes.  [Evidentiary Hearing ("EH") Ex. 1].

Smith related this information to Officer Martin McCoy, and both McCoy and Smith wrote reports reflecting the foregoing facts.  [EH Exs. 1 & 2].

Recognizing that the information was relevant, but concerned about the safety of the informant, the prosecutor sought an in camera hearing.  Petitioner and his counsel were excluded.  Over the course of two hearings – on January 19 and 22, 1979 – the prosecutor emphasized that the information "A" claimed Bischoff had provided to him during the telephone call differed from the information Bischoff

_____

Court and parties have referred to certain witnesses by letters instead of by their names. [See March 2, 2007 Order & Ex. B]. In light of the passage of time, this precaution may no longer be necessary. Nevertheless, out of an abundance of caution, the Court retains it.

gave the police during her January 9, 1979 interview.[5]   As the prosecutor realized, the information in the police reports "lends itself to impeachment of Bischoff, and very definitely; and Bischoff is the State's only star witness.   I mean, she is the case. So this could very well be impeachment of Bischoff, because the facts are different in some respects from what she'll testify." [EH Ex. 3 at 4].

The trial court agreed, finding that "A"'s telephone conversation with Bischoff – as well as the fact that "A" voluntarily called the police to report the information in the first place – were "extremely relevant to the defense," for several reasons, including that "A"'s knowledge of the details of the crime suggested that "A" may have been present during the murder.   [EH Ex. 3 at 9-11].   Relevance aside, the prosecutor argued that the report itself should not be turned over to petitioner because doing so would endanger the lives of "A" and his family.   [EH Ex. 3 at 4-6].   The prosecutor suggested a method of providing the information to the defense, and the trial court adopted that suggestion.

In the end, the trial court directed the prosecution to turn over a "sanitized" version of the information.   McCoy was to re-interview "A" and prepare a new report containing the same information as the original report, but the new report would be prepared as if McCoy had initiated the contact with "A." This way, "A"'s status as an informant would remain protected.   In order to accomplish this, the prosecutor proposed that McCoy "simply ask Mary if she talked to this man.   She says yes.   And as a routine matter he interviews the man, who does tell him all of these facts." [EH Ex. 3 at 5-7, 11-13].   The trial court

---

[5]It also turned out to be different from Bischoff's eventual testimony at petitioner's trial.

agreed, and directed the prosecution to begin by having McCoy ask Bischoff whether or not she talked to "A." During the hearing, the trial court reiterated that it believed the report was "extremely relevant" to the defense.  [EH Ex. 3 at 11-13].[6]

At the second in camera hearing, "A" testified that he believed he would be killed if he was labeled as a snitch or informant by the motorcycle gang. [EH Ex. 4 at 5-7].  The prosecutor argued that some of the things written in the police reports were inaccurate, and told the trial court that "A" claimed that the reporting officer had either misconstrued or embellished "A"'s statements. [EH Ex. 4 at 13].  The trial court instructed McCoy that he was required to "get a good interview with ["A"]" and that "it be accurate," and further clarified that "I'm convinced that the law is not going to allow any longer the - a non-discovery which is otherwise discoverable by just holding it in the head of a police officer -."  Finally, the trial court made clear that while the report itself, which identified "A" as an informant need not be turned over to the defense, "there's nothing I have said that says you don't have to disclose this person's name as having been interviewed by Mr. McCoy."  [EH Ex. 4 at 18-21].

Despite these orders, the prosecutor and McCoy both failed to provide petitioner with information about Bischoff's alleged telephone call to "A."  More than nine months passed.  Petitioner was never told about "A" or about the facts Bischoff allegedly told "A" during the

---

[6]   When the trial court wondered aloud how the prosecution should proceed if "A" failed to tell McCoy the same facts he had reported to Smith in the original telephone call, the prosecutor made a disturbing statement.  He said, "then we're in a very bad position, I'll have to say.  The court, I think, can well see the temptation - ... - at that point there is to forget these kinds of reports; but we're held to a high standard, and I think we have to, with these problems." [EH Ex. 3 at 23].

telephone call.   The reports themselves, as well as the ex parte
proceedings related to them, remained concealed for almost thirty
years.

Petitioner proceeded to trial without the information.  Bischoff,
the prosecution's "star" witness, was granted immunity for her
testimony.   Bischoff testified that she and J.T. were involved in a
romantic relationship from 1974 to 1978.   Bischoff and J.T. were
employed by Paisano Publications.   They worked at motorcycle-oriented
swap meets that generated large amounts of cash.  J.T. used, possessed,
and sold drugs including cocaine, marijuana, and amphetamines.   In
1977, petitioner began working security at the swap meets.   Petitioner,
J.T., and Bischoff became friends.  [Reporter's Transcript on Appeal
("RT") 677-692, 764, 1013-1015, 1017-1023, 1054-1057, 1061-1066, 1070-
1077, 1084-1096, 1106-1108, 1453, 1456-1463].

In June 1978, Bischoff and J.T. broke up.  Bischoff moved out of
J.T.'s home and moved into Sterling Holt's home.  Soon thereafter,
Bischoff and petitioner became involved in a romantic relationship. [RT
692-694, 1108-1118, 1159-1167, 1175-1183, 1577-1579].[7]

While Bischoff and petitioner traveled out of state, J.T. moved
into Holt's house.  When Bischoff returned to California, she stayed
with petitioner at Cain Dewitt's house.  Her possessions, however,
remained at Holt's house.  Bischoff frequently complained about missing
her belongings, and this upset petitioner.  According to Bischoff,

---

[7]   Although Bischoff testified that J.T. was upset that she
was dating petitioner [RT 709-710], other evidence contradicted her
claim.   In particular, several of J.T.'s friends testified that
J.T. and Bischoff were separated at the time of his murder, J.T.
was living with another woman, J.T. did not want Bischoff back
(and, in fact, he was relieved that Bischoff was gone), and J.T.
and petitioner seemed to have a good, friendly relationship.  [RT
1900-1902, 2033, 2099-2101, 2216, 4304].

after one of her complaints about her belongings, petitioner said that
there was a contract out on J.T., and that he was going to blow J.T.'s
brains out. [RT 742-757, 765-769, 2032-2033].[8]

Bischoff was the only witness who placed petitioner away from
Dewitt's house on the night of J.T.'s murder. According to Bischoff,
she, petitioner, and Bo Messer ate dinner at Dewitt's house on November
10, 1978. At around 7:30 or 8:00 p.m., petitioner and Messer left the
house. Petitioner had a chrome .38 pistol in his belt.[9] While they
were gone, Bischoff smoked two marijuana cigarettes laced with angel
dust. She also used cocaine. According to Bischoff, petitioner
returned to the house around 11:00 p.m. or midnight. His clothes were
wet and dirty. He said that he had thrown up on them, and Bischoff
noticed that there were food particles on his clothes. She did not see
the gun that petitioner had when he left. Petitioner then sat in the
kitchen and talked to the people there, including Messer, DeWitt, Sammy
Chavez, and others. The conversation was normal, and there was nothing
unusual about petitioner's behavior. [RT 818-819, 823-829, 831, 834,
840-851, 867, 1394-1397, 1409].

The next day, Bischoff, petitioner, and Messer got into a silver
van and headed for Castro Valley, a place they previously had visited
and had discussed moving to. On the way, they stopped at Holt's house
to pick up Bischoff's belongings. When they arrived, others were in the

---

[8]   On cross-examination, Bischoff admitted that she had
appeared unannounced at the office of petitioner's counsel and told
him that she did not know why she had said that petitioner had
threatened to blow J.T.'s brains out because petitioner never had
said that. [RT 1582, 1603]. On redirect, Bischoff explained that
she had lied to petitioner's counsel, and that petitioner really
did make the threat. [RT 1603].

[9]   Bischoff previously had testified that she did not see
petitioner leave carrying the gun. [RT 1419-1420].

1  house, but J.T. was not home. [RT 869, 878, 884-886, 891-895, 940-944,

2  966, 972-974].

3      Bischoff gathered her belongings, which were spread throughout the

4  house.  Bischoff observed Messer moving about the house, and he took

5  several things, including J.T.'s black briefcase and keys, and a pocket

6  knife that belonged to Holt. [RT 898-909, 939, 1434-1439, 1468-1469,

7  1508-1509].

8      Bischoff, petitioner, and Messer left Holt's house at around 5:00

9  a.m., and drove toward Castro Valley.  Bischoff noticed an orange

10 pillowcase in the van, in which she found J.T.'s wallet, including his

11 American Express card; a metal cash box, which held various papers and

12 $2,000 in new 100 dollar bills; and a manila envelope containing papers

13 belonging to Holt.  Messer told Bischoff that the pillowcase had been

14 in the closet at Holt's house. [RT 1512, 1515-1517, 4142].

15     The three used J.T.'s credit card on the way to Castro Valley and

16 while they were there.  They stayed in a motel for a week, and then

17 stayed with Ted LeBlanc.  On November 21 or 22, 1978, Bischoff called

18 her mother's house and learned that J.T. was dead and that the police

19 were looking for Bischoff and petitioner.  Bischoff told petitioner,

20 who said not to worry about it, and to tell the truth. [RT 965-

21 968,1328-1331, 1341-1344, 1527-1528, 1544-1546, 1551].

22     Soon thereafter, Bischoff called Bruce Robertson several times.

23 Robertson told Bischoff that he believed petitioner was responsible for

24 J.T.'s death.  The day after Thanksgiving, Bischoff left petitioner,

25 and flew to New Jersey.  While there, she spoke with Robertson again.

26 Robertson arranged for her to return to California to talk to the

27 police.  Robertson had a first class ticket waiting for her at the

28 airport.  During the flight, Bischoff drank champagne, wine, whisky,

beer, and a couple of Bloody Marys.  When she arrived at LAX, she was met by Robertson, McCoy, and another police officer.  Robertson took Bischoff to a bar in the airport where she, Robertson, and the police officers drank beer.  Robertson then drove Bischoff to the police station.  On the way, they stopped again and Bischoff had another beer.  During the drive, Robertson reiterated to Bischoff that petitioner was responsible for J.T.'s death.  [RT 294-295, 990-993, 1001-1103, 1540-1565, 2368-2369].

At the police station, Bischoff was interviewed by McCoy and a deputy district attorney.  Bischoff initially gave one set of answers to certain questions, but then – after speaking to Robertson off the recording – she changed her story.  [RT 1564-1568, 2645-2646].[10]

Robertson, who had known J.T. for about four months and was J.T.'s attorney, also testified on behalf of the prosecution.[11]  According to Robertson, he saw J.T. on the morning of November 10, 1978, at which time J.T. possessed a .45 pistol, a rifle, and a pump shotgun.  J.T. said that the weapons were for protection from "Bischoff's boyfriend." At approximately 9:00 p.m., Robertson telephoned J.T., and they discussed getting together the next day to watch a football game.  J.T. told Robertson that he was expecting "Desert Dave" (Dave Olson) and

---

[10]  The defense also presented evidence that when Bischoff was in jail before petitioner's trial, she told McCoy that if he did not get her out of jail, she would take the witness stand and testify that Robertson had told her what to say. [RT 2655].  In addition, DeWitt testified that Bischoff told him that Robertson was telling her what to say.  [RT 2761-2767, 2781].

[11]  Robertson initially represented Bischoff in connection with J.T.'s murder.  [RT 289].  He also represented five other prosecution witnesses in connection with the case: Holt, Mike McClannon, Dave Olson, Mike Gross, and Bonnie Mellinger. [RT 286-292].  In addition, Robertson represented the estate of J.T. and members of J.T.'s family. [RT 219].

"Desert Mike" (Mike Gross) around midnight.  At approximately 11:00
p.m., Robertson tried calling J.T. again, but the line was busy.  He
called four or five times, and finally, at around midnight, was told
by an emergency operator that J.T.'s telephone was off the hook.  [RT
23, 27-29, 31, 40-43, 33, 53, 119, 239-243, 4306, 4308].

Olson also spoke with J.T. on November 10, 1978.  J.T. told him
that he and Bischoff were "broken up," and that Bischoff would be
coming over to collect her belongings, but he did not say when she
would be arriving.  At around 12:30 a.m. on November 11, 1978, Gross
and Olson arrived at Holt's house to purchase two pounds of marijuana
and some cocaine.[12]  J.T. was not home.  [RT 1678-1680, 1682-1683, 1780-
1781, 1818-1823, 1848, 1900-1902].

J.T.'s body was discovered on November 12, 1978 near Highway 33,
approximately 25 to 30 miles from Holt's house. There was tape around
his wrists.  The cause of death was multiple gunshot wounds.  [RT 323-
325, 334-446, 496-499, 503].

On November 28, 1978, petitioner was arrested in a gray van on an
unrelated charge.  Inside the van, the police found a black briefcase
which contained a wig, .38 caliber shells, gloves, seven $100 bills,
a motel bill from Castro Valley, and an American Express receipt in the
name of J.T. McGarry.  No fingerprints were found on these items.  A
.38 caliber Smith and Wesson revolver also was found, but the gun was
not the murder weapon.  No blood was found in the van. [RT 458-468,
581-584, 631-633, 661-662].

Petitioner testified in his own defense.[13]  As petitioner described

---

[12]  Both Gross and Olson testified after receiving immunity.
[RT 1677, 1866].

[13]  Petitioner admitted to a prior criminal record consisting
of theft, attempt to pass a forged check, furnishing drugs in 1971,

it, although he and Bischoff had a romantic relationship, it was not exclusive, and neither Bischoff nor the other women with whom petitioner was involved were upset by this arrangement. Petitioner explained that he worked for J.T., that he and J.T. socialized together, and that they got along well. At the time of the murder, petitioner believed that J.T. was a friend. Petitioner was certain that Bischoff had left J.T., and he was not aware of any animosity between himself and J.T. [RT 3212-3220, 3232, 3262-3276, 3418-3424].

On November 10, 1978, petitioner arrived at Dewitt's house a little after 8:00 p.m. Bischoff was at the house smoking angel dust. After a few minutes in the house, petitioner spent the next two or three hours in the garage working on motorcycles. Different people came and went, including Dave Martin and Sammy and his wife (who were in the garage for about an hour or hour and a half). Sammy and his wife departed at approximately 10:30 or 11:00 p.m., after which petitioner and Messer left briefly to get beer.[14] On his way back from the store, petitioner vomited on himself. Frequent nausea was a residual effect of a motorcycle accident in which petitioner had been injured, and the ensuing surgery. Petitioner returned to the house.

_____

and possession of stolen mail in 1968. [RT 3190, 3697-3701, 3703-3706].

[14] Other persons who were at Dewitt's house on November 10, 1978 confirmed petitioner's presence throughout the night. From 8:00 p.m. to after 11:00 p.m., these individuals had seen petitioner in the garage working on motorcycles. They also confirmed that Bischoff was smoking marijuana and angel dust and was high on drugs that night. [RT 2733-2760, 2755-2756, 2783, 2923-2932, 2981-2983, 3013-3020].

In addition, Dr. George Chappell testified about the psychological effects of PCP (also known as "angel dust"). He explained that PCP can cause disorientation, hallucinations, and misperception. With high doses of PCP, amnesia – that is, an inability to recall the events that occurred while under the influence of the PCP – is "almost universal." [RT 3149-3183].

He figured it was about 11:15 p.m. because the news was on TV. Petitioner cleaned up, and then stayed in the house for the rest of the night. [RT 3340-3347, 3425-3438, 3442, 3451-3453, 3475-3481; see also RT 742-743, 1314, 1326].

Petitioner planned to drive to Castro Valley the following day. Since they were driving north, petitioner told Bischoff that they could stop at Holt's house to get her belongings.  They remained at Holt's house for about an hour while Bischoff gathered her belongings.  [RT 3482-3485, 3513-3521].

Petitioner testified that he did not take anything out of Holt's house that night, but Messer and Bischoff loaded various things in the van. [RT 3522-3523].  It was not until they had been driving for a while that petitioner saw the cashbox in the van.  Later, Bischoff showed petitioner J.T.'s wallet and credit card.  When petitioner asked Bischoff where the credit card came from, she replied that since J.T. still owed her money,[15] they could use the card.  She added that J.T. would not even have to pay because the card was really a company card for business expenses. [RT 3544-3553].

Petitioner explained that at the time he was using the credit card, he did not know that J.T. was dead.  Once he learned of J.T.'s death, petitioner destroyed the wallet and the credit card.  According to petitioner, if he had known that J.T. was dead, he never would have gone to Holt's house that night, and he never would have used J.T.'s credit card.  [RT 3635-3638].

---

[15]  Petitioner reported that Bischoff had told him that she and J.T. had been skimming money from Paisano Publications, and that J.T. had kept 30,000 or 35,000 dollars, half of which belonged to her.  [RT 3291-3295].  Bischoff also testified that she told petitioner that J.T. owed her money, and that she asked petitioner if he could get the money for her. [RT 669-704, 1352-1357].

The day after Thanksgiving, when petitioner returned from an errand, he discovered that Bischoff was gone.  She left a few things behind, including the cashbox and the briefcase.  Petitioner never removed those things from the van.  While he was concerned about the wallet and credit card, he was not worried about the cashbox or briefcase because he believed that they belonged to Bischoff and that she had picked them up when they went to Holt's house.  [RT 3650-3660, 3666-3667].

On September 24, 1980, petitioner was convicted of first degree murder.  The jury also found true the allegation that the murder was committed during a burglary.  [CT 214-215].  Petitioner was sentenced to life in prison without the possibility of parole. [CT 220].

Petitioner appealed to the California Court of Appeal, and also filed a habeas petition in that court.  The state appellate court affirmed petitioner's conviction and denied his habeas petition. [Answer, Exs. A-D].  Petitioner then filed a petition for review in the California Supreme Court, which was denied. [Answer, Ex. E].

Petitioner also filed several habeas petitions in the state courts, all of which were denied. [Answer, Exs. F-I]. Petitioner's latest state petitions, filed in the California Court of Appeal and the California Supreme Court, were essentially identical to his current federal petition, including the attached exhibits. [Answer, Exs. F & H].  Both petitions were denied without comment, meaning that the state courts considered and rejected petitioner's claims on the merits. [Answer, Exs. G & I].[16]  See Gaston v. Palmer, 417 F.3d 1030, 1038 (9th

---

[16]   In his habeas petition filed in the California Court of Appeal, petitioner expressly requested an evidentiary hearing. [Answer, Ex. F at 361].

13

1   Cir. 2005) (stating that "[w]e construe 'postcard' denials such as

2   these to be decisions on the merits"), amended, 447 F.3d 1165 (9th Cir.

3   2006) (citing Hunter v. Aispuro, 982 F.2d 344, 347-348 (9th Cir. 1992),

4   cert. denied, 510 U.S. 887 (1993)), cert. denied, 549 U.S. 1134 (2007).

5       Petitioner previously filed a habeas petition in this Court.  Case

6   No. CV 83-5904-KN(B).[17]   The petition was denied on the merits, and

7   judgment dismissing the petition with prejudice was entered on August

8   16, 1984.   [Respondent's Motion to Dismiss, Exs. B & C].

9       On November 23,2004, the Ninth Circuit granted petitioner's

10

11          [17]  Contrary to respondent's suggestion [see Respondent's Brief
     Re Procedural Issues at 1-2], none of the claims presented in this
12   second federal habeas petition are the same as those presented in
     petitioner's previously filed federal habeas petition.
13   Respondent's assertion appears to be based upon a misreading of
     petitioner's contention that the claims in this second federal
14   habeas petition have been exhausted because they were fairly raised
     in his state petitions. [See Petitioner's Response to Respondent's
15   Brief Re Procedural Issues at 6-7 & Exs.].   In any event,
     petitioner's original claim that the trial court erred by ruling
16   that certain evidence was non-discoverable, and then allowing the
     prosecution "intimidate" the defense with that evidence, is not the
17   same as the present claim that the prosecution failed to disclose
     exculpatory evidence.
18       Further, respondent's contention that petitioner's Brady claim
19   is rendered unexhausted because the facts developed in the course
     of litigating this second federal habeas petition have changed the
20   nature of his claim is unpersuasive. [Respondent's Brief Re
     Procedural Issues at 9-12].   Petitioner's claim, as set forth in
21   his state petitions and in this second federal habeas petition,
     alleged that the prosecutor withheld facts contained in a police
22   report.   This is still petitioner's claim.   The fact that
     petitioner attempted to guess at the particular information
23   contained in the police report (or reports), and the fact that his
     guess sometimes came closer to what was eventually discovered in
24   the reports and related materials than others, do not alter the
     fundamental nature of his claim.   See Weaver v. Thompson, 197 F.3d
25   359, 364-365 (9th Cir. 1999); Chacon v. Wood, 36 F.3d 1459, 1468
26   (9th Cir. 1994).   This is especially appropriate given that
     petitioner's lack of particularized knowledge of the contents of
27   the reports and related proceedings was the result of the
     prosecutor's wrongful conduct which resulted in those reports being
28   erroneously sealed for close to 30 years.

request for authorization to file a second habeas petition in this Court.

An evidentiary hearing was held in this Court on August 12 and August 13, 2008. During the evidentiary hearing, Bischoff denied ever calling "A," and testified that she flew out of LAX on November 24, 1978, two days before "A" claimed she called him from there. [Evidentiary Hearing Transcript ("EHT") 62-64]. She said that the telephone call to "A" never happened, and that the details that "A" reported she had told him were wrong. In particular, she testified that she never saw blood on petitioner; that the substance she saw on petitioner's clothes the night of the murder was "typical vomit;" and that she never saw blood in the van. [EHT 71-72]. She also testified that she and J.T. worked for "A," that J.T. skimmed money that belonged to "A," and that "A" likely knew that about the skimmed money. [EHT 64-68]. Finally, Bischoff testified that neither the prosecutor nor McCoy ever asked her if she had called "A." [EHT 73-74].

## Discussion

### Standard of Review

Petitioner's claim that he was deprived of due process by the prosecutor's suppression of exculpatory evidence was not presented in his first federal habeas petition. Consequently, the first question that must be resolved is the applicable standard of review.

A habeas petitioner is generally required to present all of his or her grounds for relief simultaneously rather than serially. See 28 U.S.C. § 2244(b)(3)(A). Ordinarily, a claim presented in a second or successive habeas petition that was not presented in a prior application must be dismissed unless (a) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review;

or (b) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(3).

As the Supreme Court repeatedly has made clear, not every numerically second petition is "second or successive" for purposes of Section 2244(b).  See Magwood v. Patterson, 130 S.Ct. 2788, 2803 (2010) (holding that a petitioner's challenge to his death sentence which was imposed after a re-sentencing proceeding is not "second or successive" under §2244(b)); Panetti v. Quarterman, 551 U.S. 930, 943-944 (2007) (holding that a petitioner's Ford[18] claim that he was incompetent to be executed is not "second or successive"); Slack v. McDaniel, 529 U.S. 473, 487 (2000) (holding that a petition filed after a mixed petition has been dismissed before the district court has adjudicated any claim is not a second or successive petition); Stewart v. Martinez-Villareal, 523 U.S. 637, 645-646 (1998) (holding that a numerically second petition alleging a claim that was contained in a first petition, but was dismissed as unripe, is not second or successive).  Rather, "second or successive" is a term of art, and courts interpreting it generally apply principles established by precedents concerning the abuse of the writ doctrine, including such decisions predating the AEDPA.  Panetti, 551 U.S. at 947 (considering abuse of the writ precedents in determining whether a petitioner's Ford claim was second or

---

[18] A Ford claim alleges that the petitioner is incompetent to be executed.  Ford v. Wainwright, 477 U.S. 399 (1986).

16

successive); <u>see also</u> <u>United States v. Lopez</u>, 577 F.3d 1053, 1063-1066 (9th Cir. 2009), <u>cert. denied</u>, 130 S.Ct. 1718 (2010); <u>Singleton v. Norris</u>, 319 F.3d 1018, 1023 (8th Cir.) (en banc), <u>cert. denied</u>, 540 U.S. 832 (2003); <u>Esposito v. United States,</u> 135 F.3d 111, 113 (2d Cir. 1997) (per curiam); <u>Pratt v. United States</u>, 129 F.3d 54, 60 (1st Cir. 1997), <u>cert. denied</u>, 523 U.S. 1123 (1998); <u>Reeves v. Little</u>, 120 F.3d 1136, 1138 (10th Cir. 1997) (per curiam).  Pursuant to such principles, a petition containing a claim that "the petitioner had no fair opportunity to raise" in his first federal habeas petition is not a "second or successive" application.  <u>Magwood</u>, 130 S.Ct. at 2803 (Breyer, J., concurring) (citing <u>Panetti</u>, 551 U.S. at 946).

Under the abuse of the writ doctrine, a numerically second petition is "second or successive" when it raises a claim that could have been raised in the first petition but was not so raised, either due to deliberate abandonment or inexcusable neglect. <u>McCleskey v. Zant</u>, 499 U.S. 467, 489 (1991); <u>Sanders v. United States</u>, 373 U.S. 1, 18 (1963) (explaining that "[i]f a prisoner deliberately withholds one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground....Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless, piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.").

Petitioner's second-in-time petition raising a new <u>Brady</u> claim presents what the Ninth Circuit has described as the

troublesome circumstance involving the interplay between the

1     government's failure to make a timely disclosure of <u>Brady</u>

2     information and the provisions of the [AEDPA] which, in the

3     interest of finality, impose significant burdens on

4     defendants who try to raise new claims in "second or

5     successive" habeas petitions.

6  <u>Lopez</u>, 577 F.3d at 1055-1056.  In <u>Lopez</u>, the court considered at length

7  whether Lopez's second-in-time Section 2255 motion raising a <u>Brady</u>

8  claim was exempt from the AEDPA's "second or successive" petition

9  requirements.  The court, however, was able to resolve the case without

10  deciding the issue because Lopez failed to meet the less stringent pre-

11  AEDPA test for successive petitions which requires a showing of cause

12  and prejudice.  <u>Lopez</u>, 577 F.3d at 1067.  Nevertheless, what the Ninth

13  Circuit had to say on this topic is instructive.

14       Unlike Lopez, petitioner has demonstrated both cause and prejudice

15  (as discussed below), so this Court must resolve the question which the

16  Ninth Circuit was able to avoid in <u>Lopez</u>: Is a meritorious <u>Brady</u> claim

17  "second or successive" when the petitioner tried every means available

18  to him to discover material exculpatory evidence but was unable to do

19  so as a result of deliberate suppression of that evidence by the

20  prosecution, and when the failure to present the claim in a prior

21  federal petition was solely the result of the very unconstitutional

22  suppression of evidence about which the petitioner complains?  At least

23  in the circumstances of this case, the answer is no.

24       Prior to the enactment of the AEDPA, a federal court would reach

25  the merits of claims raised in second petitions if the petitioner could

26  establish cause for failing to raise the claim earlier, and prejudice

27

28

therefrom.[19]  _Lopez_, 577 F.3d at 1059-1060 (citing _McClesky_, 499 U.S. at 489).  With respect to a _Brady_ claim, the cause requirement ordinarily would be satisfied by a showing that the prosecution suppressed the evidence.  Thus, prior to the AEDPA, federal courts would reach the merits of _Brady_ claims presented in second petitions so long as the evidence suppressed was material under _Brady_.  _Lopez_, 577 U.S. at 1060 (discussing _Strickler v. Greene_, 527 U.S. 263, 289, 296 (1999), in which the Supreme Court applied an identical cause and prejudice standard to a procedurally defaulted _Brady_ claim and concluded that the government's suppression of evidence constitutes sufficient cause for failure to raise the claim, but that the petitioner was unable to establish prejudice because the suppressed evidence was not material under _Brady_).

The AEDPA codified the judicially established cause and prejudice principles, but further restricted the availability of habeas relief. In relevant part, Section 2244(b)(2) provides that a claim presented in a second or successive habeas petition which was not presented in a prior application shall be dismissed unless "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. §2244(b)(2).

---

[19]  If the petitioner failed to establish cause and prejudice, consideration of the claim was still available, but only if he or she could show that a fundamental miscarriage of justice would result from a failure to consider it.  _McClesky_, 499 U.S. at 494-495.

1   The standard prescribed by Section 2244(b)(2) is even more
2   stringent than the <u>Schlup v. Delo</u>, 513 U.S. 298, 329 (1995) standard
3   of actual innocence, a standard that requires a showing that it "in
4   light of all the evidence, including new evidence, it is more likely
5   than not that no reasonable juror would have found petitioner guilty
6   beyond a reasonable doubt." <u>Cooper v. Brown</u>, 510 F.3d 870, 922 (9th
7   Cir. 2007), <u>reh'g and reh'g en banc denied</u>, 565 F.3d 561, <u>cert. denied</u>,
8   130 S.Ct. 749 (2009).  Instead, Section 2244(b)(2)(B)(ii) requires
9   petitioner to bring forth "new facts showing a high probability of
10   actual innocence." <u>Gonzalez v. Crosby</u>, 545 U.S. 524, 530 (2005).

11   For this reason, the Ninth Circuit has recognized that literal
12   application of the successive petition requirements to all second-in-
13   time <u>Brady</u> claims would have a "perverse result." <u>Lopez</u>, 577 F.3d at
14   1063-1065.  In its view, the problem with blindly applying the clear
15   and convincing evidence standard to second-in-time <u>Brady</u> claims is
16   this:

17       Given the nature of <u>Brady</u> claims, petitioners often may
18       not be at fault for failing to raise the claim in their
19       first habeas petition. It is the prosecutor who violates
20       <u>Brady</u>'s disclosure obligations by not providing favorable
21       evidence to the defense, and that prosecutorial error may
22       not surface until petitioner's first habeas petition has
23       already been resolved. Such prosecutorial error, however,
24       does not rise to the level of a constitutional violation
25       unless petitioner demonstrates a threshold level of
26       prejudice: the undisclosed evidence must be material. <u>See</u>
27       <u>Strickler</u>, 527 U.S. at 281-82, 119 S.Ct. 1936. Regardless of
28       whether a <u>Brady</u> claim is raised in a first petition or a

second-in-time petition, petitioner can prevail and obtain a new trial only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [United States v. Bagley, 473 U.S. 667, 682], 105 S.Ct. 3375 [(1985)]; see also Kyles [v. Whitley, 514 U.S. 419, 434], 115 S.Ct. 1555 [(1995)] (holding "a showing of materiality does not require demonstration by [even] a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"; rather, withheld evidence is material if, in its absence, the defendant did not receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence").

Before AEDPA's passage, if the prosecution failed to disclose the potential Brady evidence until after a first habeas petition had been resolved, the petitioner could then raise the Brady claim in a second-in-time petition so long as it was not barred by the abuse-of-the-writ doctrine. Applying the prejudice analysis in Strickler, federal courts could reach the merits of second-in-time Brady claims only when the suppressed evidence was material, and would have had to dismiss as an abuse of the writ meritless claims that did not establish materiality. See Strickler, 527 U.S. at 296, 119 S.Ct. 1936. Thus, before AEDPA, federal courts generally would have been able to reach the merits and remedy every meritorious Brady claim presented in a second-in-time petition when the "cause" prong of the abuse-of-the-writ doctrine was also satisfied.

21

1       In contrast, under a literal reading of "second or

2   successive" in AEDPA, federal courts would lack jurisdiction

3   to consider any second-in-time <u>Brady</u> claims unless

4   petitioner demonstrates by clear and convincing evidence

5   that no reasonable factfinder would have found petitioner

6   guilty of the offense had the newly disclosed evidence been

7   available at trial. <u>See</u> § 2255(h)(1). If § 2255(h) applies

8   literally to every second-in-time <u>Brady</u> claim, federal

9   courts would be unable to resolve an entire subset of

10  meritorious <u>Brady</u> claims: those where petitioner can show

11  the suppressed evidence establishes a <u>reasonable probability</u>

12  of a different result and is therefore material under <u>Brady</u>,

13  but cannot, under § 2255(h)(1)'s more demanding prejudice

14  standard, show that the evidence establishes by <u>clear and</u>

15  <u>convincing evidence</u> that no reasonable juror would have

16  voted to convict petitioner.

17  <u>Lopez</u>, 577 F.3d at 1064 (emphasis in original).[20]

18      The court in <u>Lopez</u> then discussed <u>Panetti</u>, in which the Supreme

19  Court held that a second-in-time Section 2254 petition raising a <u>Ford</u>

20  claim for the first time was not "second or successive."  In <u>Panetti</u>,

21  the Supreme Court noted that "<u>Ford</u>-based incompetency claims, as a

22  general matter, are not ripe until after the time has run to file a

23  first federal habeas petition," and that applying AEDPA's "second or

24  successive" bar to <u>Ford</u> claims raised in a second-in-time habeas

25

26      [20]  Although <u>Lopez</u> involved Section 2255(h), which applies to
second motions to vacate federal convictions or sentences, that

27  Section parallels the successive petition provisions contained in
Section 2244(b), which applies to state convictions or sentences.

28  <u>See</u> <u>Lopez</u>, 577 F.3d at 1061 n. 6 (noting that the two statutes
parallel each other).

petition would require "conscientious defense attorneys ... to file
unripe (and, in many cases, meritless) _Ford_ claims in each and every"
habeas application.   _Panetti_, 551 U.S. at 943.   The Supreme Court
solved this "dilemma" by looking to the pre-AEDPA abuse of the writ
standard:

> The phrase "second or successive" is not self-defining. It
> takes its full meaning from our case law, including
> decisions predating the enactment of [AEDPA]. The Court has
> declined to interpret "second or successive" as referring to
> all § 2254 applications filed second or successively in
> time, even when the later filings address a state-court
> judgment already challenged in a prior § 2254 application.

_Panetti_, 551 U.S. at 943-944.   The Supreme Court cited three
considerations supporting its conclusion that Congress did not intend
to subject unripe _Ford_ claims to the AEDPA's gatekeeping provisions:
(1) the implications for habeas practice of adopting a literal
interpretation of "second or successive," (2) the purposes of the
AEDPA, and (3) the Supreme Court's prior habeas corpus decisions,
including those applying the abuse of the writ doctrine. _Panetti_, 551
U.S. at 944-945.   The Supreme Court cautioned against interpreting the
AEDPA's "second or successive" provisions in a way that would foreclose
any federal review of a constitutional claim, or otherwise lead to
perverse results, absent a clear indication that Congress intended such
a result. _Panetti_, 551 U.S. at 945-946.

The reasoning in _Panetti_ is not specifically limited to _Ford_
claims, and its holding "must be considered in deciding whether other
types of claims that do not survive a literal reading of AEDPA's
gatekeeping requirements may nonetheless be addressed on the merits."

1  _Lopez_, 577 F.3d. at 1063-1064.  In _Lopez_, the Ninth Circuit recognized

2  that if all second-in-time _Brady_ claims were subject to the successive

3  petition restrictions, federal review of some meritorious claims would

4  be completely foreclosed and prosecutors would be rewarded for failing

5  to meet their constitutional disclosure obligations under _Brady_.  As

6  the court explained,

7       [t]his would seem a perverse result and a departure from the

8       Supreme   Court's   abuse-of-the-writ   jurisprudence,   _see_

9       _Strickler_, 527 U.S. at 296, 119 S.Ct. 1936. Barring these

10      claims would promote finality - one of AEDPA's purposes -

11      but it would do so only at the expense of foreclosing all

12      federal review of meritorious claims that petitioner could

13      not have presented to a federal court any sooner - certainly

14      not an AEDPA goal.

15 _Lopez_, 577 F.3d at 1065.

16      Because Lopez failed to demonstrate that the suppressed evidence

17 was material (and, therefore, could not demonstrate prejudice under

18 abuse of the writ standards), the Ninth Circuit ultimately declined to

19 resolve "the issue of whether federal courts have jurisdiction to

20 consider a subset of meritorious _Brady_ claims that federal courts would

21 have considered on the merits under the pre-AEDPA abuse-of-the-writ

22 doctrine but that would be barred under a literal reading of 'second

23 or successive' in [the AEDPA]." _Lopez_, 577 F.3d at 1056.  The court

24 also declined to decide "whether _all_ second-in-time _Brady_ claims must

25 satisfy AEDPA's gatekeeping requirements." _Lopez_, 577 F.3d at 1067

26 (emphasis in original). _Lopez_'s limited holding, then, is that _Brady_

27 claims are not "categorically exempt" from the AEDPA's successive

28 petition provisions, and that second-in-time _Brady_ claims that do not

1  establish materiality of the suppressed evidence are subject to

2  dismissal under pre-AEDPA requirements. Lopez, 577 F.3d at 1066-1067.

3      The goal of the AEDPA's successive petition limitations was to

4  curb abuse of the writ. See Lopez, 577 F.3d at 1061 (stating that the

5  bill "incorporates reforms to curb the abuse of the statutory writ of

6  habeas corpus, and to address the acute problems of unnecessary delay

7  and abuse in capital cases.") (citing H.R. Rep. No. 104-518, at 111

8  (1996), reprinted in 1996 U.S.C.C.A.N. 944). Interpreting Section

9  2244(b) to preclude review of Brady claims that could not have been

10 discovered at the time a petitioner's first federal petition was filed

11 because of the very constitutional violation at issue – that is, the

12 prosecution's concealment of exculpatory evidence – would not promote

13 this goal. Instead, such an interpretation would have perverse

14 results. Such a rule would create an incentive for the prosecution to

15 suppress evidence for as long as possible, and actually reward

16 prosecutors who are better at hiding material evidence, while punishing

17 defendants who have little or no control over when or how they discover

18 suppressed evidence. Indeed, the more grievous the prosecution's

19 suppression of evidence, the more the state would benefit. That is,

20 the longer the prosecution could prevent a defendant from realizing

21 that material evidence has been withheld, the more likely it would be

22 that the defendant would have to meet the extremely difficult burden

23 of affirmatively proving his innocence in order to obtain federal

24 habeas relief. To make matters worse, the passage of time makes it

25 even more difficult for a petitioner to meet the AEDPA's high burden

26 because – as happened in this case – over time, garnering clear and

27 convincing evidence of innocence becomes more and more difficult

28 considering that material witnesses disappear or die, and memories

fade.  Allowing the prosecution to benefit from its own constitutional
misconduct in withholding material, exculpatory evidence from
defendants cannot have been the intent of Congress in enacting the
AEDPA.  Nor could Congress have intended to essentially eviscerate
Brady by placing the onus on the defense to discover the suppression
of evidence rather than on the prosecution to promptly disclose
exculpatory evidence to the defense.  To allow the prosecution to
violate its ethical and constitutional duties under Brady to disclose
exculpatory evidence, to stall until after a first federal petition has
been filed before producing such evidence, and then to penalize the
defendant twice – once for the prosecution's original transgression,
and a second time for its subsequent fraudulent concealment and delay,
would violate notions of due process and fundamental fairness.  See
generally Cone v. Bell, 129 S.Ct. 1769, 1782 (2009) (stating that
"[a]lthough the State is obligated to 'prosecute with earnestness and
vigor,' it 'is as much [its] duty to refrain from improper methods
calculated to produce wrongful conviction as it is to use very
legitimate means to bring about a just one.'")(quoting Berger v. United
States, 295 U.S. 78, 88 (1935)); Banks v. Dretke, 540 U.S. 668, 696
(2004) ("A rule declaring 'prosecutor may hide, defendant must seek'
is not tenable in a system constitutionally bound to afford defendants
due process."); Berger, 295 U.S. at 88 (explaining that the prosecutor
is "the representative not of an ordinary party to a controversy, but
of a sovereignty whose obligation to govern impartially is as
compelling as its obligation to govern at all; and whose interest,
therefore, in a criminal prosecution is not that it shall win a case,
but that justice shall be done.  As such, he is in a peculiar and very
definite sense the servant of the law, the twofold aim of which is that

guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.").

A further reason for declining to construe the term of art "second or successive petition" to include meritorious Brady claims, is that such claims involve a constitutional violation directly related to the fairness and accuracy of the factfinding process and the fundamental question of guilt or innocence. See Strickler, 527 U.S. at 281 (emphasizing that the prosecutor plays a "special role ... in the search for truth ... [A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal [trial] is not that it shall win a case, but that justice shall be done.") (quoting Berger, 295 U.S. at 88); California Commission on the Fair Administration of Justice, Report and Recommendations on Reporting Misconduct at 2-6 (analyzing California cases involving prosecutorial misconduct, especially withholding exculpatory evidence, and noting that such prosecutorial misconduct has been identified as being among the leading causes of wrongful convictions) (www.ccfaj.org/rr-pros-official.html); Bennett L. Gershman, Litigating Brady v. Maryland: Games Prosecutors Play, 57 Case. W. Res. L. Rev 531, 533 & n. 11 (2007) ("violations of Brady are the most recurring and pervasive of all constitutional procedural violations, with disastrous consequences: innocent people are wrongfully convicted, imprisoned, and even executed"); Bennett L. Gershman, Reflections on "Brady v. Maryland", 47 S. Tex L. Rev. 685, 688 & n. 18 (2006) (citing cases in which Brady violations led to convictions of defendants who were subsequently exonerated).

Finally, as in <u>Panetti</u>, construing Section 2244(b) to include meritorious <u>Brady</u> claims that could not have been discovered at the time of a first federal habeas petition would create another undesirable incentive, this time by encouraging petitioners to include speculative and factually unsupported <u>Brady</u> claims in both state and first federal petitions to ferret out any colorable claim, and in order to avoid losing the ability to obtain federal review of any such claim. <u>See</u> <u>Strickler</u>, 527 U.S. at 286-287 ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review. Nor, in our opinion, should such suspicion suffice to impose a duty on counsel to advance a claim for which they have no evidentiary support. Proper respect for state procedures counsels against a requirement that all possible claims be raised in state collateral proceedings, even when no known facts support them. The presumption, well established by 'tradition and experience,' that prosecutors have fully 'discharged their official duties,' <u>United States v. Mezzanatto</u>, 513 U.S. 196, 210 (1995), is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.") (parallel citations omitted); <u>see</u> <u>generally</u> <u>Panetti</u>, 551 U.S. at 946.

Thus, in unusual cases like this one, where the state has withheld material information in violation of <u>Brady</u>, and the <u>Brady</u> claim would have been meritorious if the state had disclosed the evidence prior the petitioner's filing of a first federal habeas petition, the <u>Brady</u> claim should not be treated as "second or successive." Other courts have found similar ways to avoid unfair results that otherwise would have

resulted from a literal application of Section 2244(b).  See Douglas
v. Workman, 560 F.3d 1156, 1171, 1187 (10th Cir. 2009) (per curiam)
(recognizing the unfairness of applying Section 2244(b) to a petitioner
who, through "no fault of his own," had been unable to include a Brady
claim in his first petition, and holding that it was appropriate to
treat the petitioner's second petition as a "supplement" to his first
petition – which had been denied by the district court and was on
appeal in the court of appeals – rather than as a successive petition);
In re Bowen, 436 F.3d 699, 704-706 (6th Cir. 2006) (holding that the
petitioner's inability to bring his unexhausted ineffective assistance
of counsel claim in his first petition did not preclude him from
bringing that claim in a second petition where that second habeas
petition was not abusive – because the petitioner did not present a
claim that was deliberately abandoned or withheld in order to vex,
harass or delay, but rather was barred as a matter of law from bringing
his claim in his first habeas petition "through no actions of his own,"
and therefore the second petition was not "second or successive" and
was not subject to the restrictions of Section 2244(b)).[21]

    Following the reasoning of Panetti, petitioner's Brady claim is
not "second or successive," and is not subject to the standard of

_____

    [21] As was the Ninth Circuit when it decided Lopez, this Court
is aware of the decisions in Tompkins v. Sec., Dep't of Corr., 557
F.3d 1257, 1260 (11th Cir.) (per curiam) (holding that all
second-in-time Brady claims relying on events that occurred before
the filing of the first petition are subject to AEDPA's gatekeeping
provisions), cert. denied, 129 S.Ct. 1305 (2009) and Evans v.
Smith, 220 F.3d 306, 323 (4th Cir. 2000) (same, at least where the
petitioner failed to show due diligence in attempting to ascertain
the relevant facts), cert. denied, 532 U.S. 925 (2001).  See Lopez,
577 F.3d at 1068, n. 15.  Nevertheless, for the reasons discussed
above, and in the unusual circumstances of this case, this Court
finds those decisions unpersuasive.

1  review set forth in Section 2244(b).

2  **Cause and Prejudice/Merits**

3  A Brady claim consists of three necessary elements: "(1) [t]he
4  evidence at issue must be favorable to the accused, either because it
5  is exculpatory, or because it is impeaching, (2) that evidence must
6  have been suppressed by the State, and (3) prejudice must have ensued."
7  Jackson v. Brown, 513 F.3d 1057, 1071 (9th Cir. 2008) (quotations and
8  citation omitted).  "To determine whether prejudice exists, we look to
9  the materiality of the suppressed evidence." Jackson, 513 F.3d at 1071.
10 "[E]vidence is 'material' within the meaning of Brady when there is a
11 reasonable probability that, had the evidence been disclosed, the
12 result of the proceeding would have been different." Cone, 129 S.Ct.
13 at 1783. In other words, petitioner need not show that he "would more
14 likely than not have received a different verdict with the evidence,"
15 instead, he must show only that "the government's evidentiary
16 suppression undermines confidence in the outcome of the trial."
17 Valdovinos v. McGrath, 598 F.3d 568, 576-577 (9th Cir. 2010) (quotation
18 and citation omitted), petition for cert. filed, 79 USLW 3063 (July 20,
19 2010)(No. 10-136).  Finally, the court must consider the materiality
20 of the evidence suppressed by the Brady violations collectively rather
21 than item by item. Kyles v. Whitley, 514 U.S. 419, 436-437 (1995).

22 The showing required to establish cause and prejudice parallels
23 the essential elements of a Brady claim.  See Banks, 540 U.S. at 691;
24 Strickler, 527 U.S. at 281-282.  That is, cause is demonstrated by
25 showing that the prosecution suppressed evidence so that petitioner was
26 unable to discover and raise his claim, and prejudice is demonstrated
27 by showing that but for the suppression of the evidence, petitioner
28 would have prevailed on his Brady claim.  Thus, if petitioner

1   establishes cause and prejudice, he also has demonstrated that his

2   Brady claim is meritorious.

3       **Cause**

4       Petitioner has shown cause for failing to raise his Brady claim

5   in his first petition.  That petition was filed on August 16, 1983.

6   In order to state a cognizable Brady claim, petitioner would have had

7   to allege facts showing that the prosecution failed to disclose

8   exculpatory or impeachment evidence that was material either to

9   petitioner's guilt or to his punishment.  Brady, 373 U.S. at 87.

10  Petitioner could not simply allege that some unknown exculpatory

11  evidence was withheld from him.  Rather, he would have had to specify

12  what the suppressed evidence was and explain why it was both

13  exculpatory and material.  If petitioner had alleged such facts in a

14  federal habeas petition, and if the state courts had failed to provide

15  petitioner with an evidentiary hearing despite his allegations, then

16  petitioner would have been entitled to an evidentiary hearing in

17  federal court at which he could fully develop the facts surrounding the

18  claim.  See Baja v. Ducharme, 187 F.3d 1075, 1077-78 (9th Cir. 1999),

19  cert. denied, 528 U.S. 1079 (2000).[22]

20

21       [22] A federal habeas petitioner is entitled to an evidentiary
    hearing on a claim as to which the facts are disputed if two
22  conditions are met: (1) the petitioner's allegations would, if
    proved, entitle him to relief; and (2) a state court has not, after
23  a full and fair hearing, reliably found the relevant facts. Jones
    v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997). The AEDPA affects a
24  petitioner's entitlement to an evidentiary hearing only if the
    petitioner "failed to develop" the factual basis of a claim in
25  state court. See 28 U.S.C. § 2254(e)(2). In Williams v. Taylor, 529
    U.S. 420 (2000), the Supreme Court held that Section 2254(e)(2)
26  only precludes a hearing where there has been "[a] lack of
    diligence, or some greater fault, attributable to the prisoner or
27  the prisoner's counsel" in failing to present the factual basis for
    the claim. Williams, 529 U.S. at 435-437.
28

The record shows that petitioner diligently attempted to obtain the facts necessary to litigate his claim by raising it in the state courts and requesting that the sealed records be unsealed.  The record also demonstrates that petitioner was denied access to the sealed records, and that he could not have known what those sealed state court records contained until 1992 – long after his first federal petition was denied – when he learned about the existence of a police report from investigator Robert Temple, who is now deceased.[23]

During his trial, petitioner had been led to believe that the allegedly non-discoverable, sealed evidence related to his tattoo. [See RT 3850-3854].   From the time he learned that there was sealed evidence, petitioner made numerous and nearly continuous attempts to find out what it was, but he was rebuffed at every turn. [See Petitioner's Memorandum Re: Exhaustion at 2-4, Exs. B & C (detailing petitioner's motions, appeals, and other efforts to discover the contents of sealed records)].  Without knowing what was in the sealed records, it would have been mere speculation for petitioner to raise a claim in either state or federal court alleging that that the prosecutor had withheld exculpatory evidence, and any such claim would have been dismissed as conclusory. See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("It is well-settled that conclusory allegations which

---

[23]   Temple was retained in 1983 or 1984 by Bill Harter of the California Public Defender's Office to conduct an investigation on petitioner's behalf.  In his 1995 declaration, Temple states that "in the discovery material on Hanline's case there was a report which I saw from a Los Angeles Police narcotics officer or informant." According to Temple, the report indicated that a group of Robertson's associates were laughing about petitioner taking the blame for the murder they had committed. [Petitioner's Ex. 22]. Petitioner did not learn about the information contained in Temple's declaration until 1992 – after his first federal petition was denied. [Petition at 46].

1  are not supported by a statement of specific facts do not warrant

2  habeas relief.") (internal quotation marks, brackets, and citation

3  omitted); In re Cudjo, 20 Cal.4th 673, 687 (1999) ("A habeas corpus

4  petitioner bears the burden of establishing that the judgment under

5  which he or she is restrained is invalid. To do so, he or she must

6  prove, by a preponderance of the evidence, facts that establish a basis

7  for relief on habeas corpus.") (citations omitted).

8         Considering the foregoing, petitioner could not have discovered

9  the factual predicate for his Brady claim at the time he filed his

10  first federal petition, and he has demonstrated cause for his failure

11  to include that claim in that petition. See Banks, 540 U.S. at 692-693

12  (holding that the petitioner was not at fault for failing to develop

13  the factual basis of a Brady claim in state court because the

14  prosecutor had continually suppressed evidence that one of its main

15  trial witnesses had been a police informant); Strickler, 527 U.S. at

16  283 (holding that the state's suppression of a prosecution witness's

17  notes together with its announced open file policy which led the

18  defense to believe it had received all relevant evidence, constituted

19  cause for excusing the procedural default of a Brady claim); Crivens

20  v. Roth, 172 F.3d 991, 996 (7th Cir. 1999) (finding cause for the

21  failure to raise a Brady claim in state court where the state failed

22  to provide the information relevant to the Brady claim until after the

23  state habeas petition was filed, and holding that "[w]e will not

24  penalize Crivens for presenting an issue to us that he was unable to

25  present to the state courts because of the state's misconduct") (citing

26  Reed v. Ross, 468 U.S. 1, 14 (1984)).

27     **Prejudice**

28         Due process requires the prosecution to disclose to the defense

any material evidence that is either exculpatory or impeaching.
Strickler, 527 U.S. at 281-282; Pennsylvania v. Ritchie, 480 U.S. 39,
57 (1987); United States v. Bagley, 473 U.S. 667, 674 (1985); Brady,
373 U.S. at 87.   The prosecution's affirmative duty to disclose
evidence flows from the recognition that the prosecutor is the
representative of the government, whose interest in a criminal
prosecution is "not that it shall win a case but that justice shall be
done." Berger, 295 U.S. at 88.   Thus, the prosecution's duty of
disclosure is not dependent upon a request for information by the
defense.   Kyles, 514 U.S. at 432-434.   As the Ninth Circuit has
explained, "the disclosure obligation exists, after all, not to police
the good faith of prosecutors, but to ensure the accuracy and fairness
of trials by requiring the adversarial testing of all available
evidence bearing on guilt or innocence." Carriger v. Stewart, 132 F.3d
463, 480 (9th Cir. 1997) (en banc) (citing Kyles, 514 U.S. at 438-441
and Brady, 373 U.S. at 87), cert. denied, 523 U.S. 1133 (1998).

Evidence is exculpatory if it is "merely favorable to the
accused." Gantt v. Roe, 389 F.3d 908, 912 (9th Cir. 2004) (internal
quotation marks and citation omitted). The evidence does not have to
affirmatively prove the defendant innocent; but merely must satisfy the
"low favorable to the accused standard." Gantt, 389 F.3d at 912.
Brady requires disclosure of both exculpatory and impeachment evidence.
Bagley, 473 U.S. at 676; Benn v. Lambert, 283 F.3d 1040, 1052 (9th
Cir.), cert. denied, 537 U.S. 942 (2002). In addition, exculpatory
evidence includes evidence enabling a defendant to attack the
thoroughness and good faith of an investigation, albeit typically in
cases where the suppressed evidence is needed to impeach a government
witness.   See Kyles, 514 U.S. at 445.   Evidence is material, and

34

disclosure is constitutionally required, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Kyles</u>, 514 U.S. at 433-434 (quoting <u>Bagley</u>, 473 U.S. at 682); <u>see also</u> <u>Brown v. Borg</u>, 951 F.2d 1011, 1015 (9th Cir. 1991). Stated differently, the Constitution mandates disclosure of favorable evidence when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Cone</u>, 129 S.Ct. at 1782-1783 (quoting <u>Kyles</u>, 514 U.S. at 435); <u>accord</u> <u>Banks</u>, 540 U.S. at 698-699. Finally, to qualify as material for <u>Brady</u> purposes, the information suppressed by the prosecution must either be admissible or lead to admissible evidence. <u>Paradis v. Arave</u>, 240 F.3d 1169, 1176 (9th Cir. 2001); <u>Coleman v. Calderon</u>, 150 F.3d 1105, 1116-1117 (9th Cir.), <u>rev'd on other grounds</u>, 525 U.S. 141 (1998); <u>see also</u> <u>Wood v. Bartholomew</u>, 516 U.S. 1, 5-7 (1995) (per curiam) (holding that polygraph results were not material under <u>Brady</u> because the results were inadmissible under state law and therefore were not "evidence," and because the polygraph results would not have led to any additional admissible evidence). A review of the evidence suppressed by the prosecution in this case confirms that petitioner easily passes the prejudice test.

**The "Eight Page Report"**

Petitioner's claim is largely based upon the suppression of evidence contained in the two police reports memorializing the telephone call from confidential informant "A" to the police, and what "A" alleged that Bischoff had told him. [EH Exs. 1 & 2; EHT at 64]. Specifically, as described above, "A," the former employer of Bischoff and J.T., called the police and told them that Bischoff had called him and provided details about J.T.'s murder. The statements Bischoff

allegedly made to "A" in November, 1978 differed materially from both her December, 1978 statement to police and her subsequent trial testimony.

As everybody who knew about the suppressed evidence agreed, "A"'s telephone call to the police and the substance of that telephone call were material and relevant to petitioner's defense. At a minimum, the evidence would have impeached Bischoff, whom the prosecution conceded was the state's "star" witness. But, perhaps more importantly, the evidence could have been used to suggest that others had killed J.T. and were framing petitioner. These others potentially included "A", who had a motive for killing J.T. that arguably was stronger than petitioner's. Despite recognizing the importance of the evidence to the defense, and in spite of the trial court's order requiring the prosecutor to turn the evidence over to the defense, both the prosecutor and McCoy failed to disclose the evidence to petitioner.[24]

**The "Twelve Page Report"**

Petitioner also alleges that the prosecutor withheld other material evidence. The "Twelve Page Report" at issue consists of five shorter reports. The first is an October 23, 1978 report reflecting an anonymous phone call from "E" – who basically names various drug dealers, including Larry New and Jim Foster (aka William Stymus). [EH

---

[24] After the trial court ordered the prosecutor to provide the information to the defense, more than nine months went by, during which the prosecutor kept the information from petitioner. Eventually, the trial court ordered the reports themselves sealed [EH Ex. 13; see EH Ex. 12], but the trial court never altered its original order that the information contained in the reports had to be disclosed. To the contrary, the record demonstrates that the prosecutor understood that the sealing of the report which revealed "A"'s status as a confidential informant did not mean that the prosecutor could evade his responsibility to disclose the relevant material evidence to petitioner. [EH

Ex. 5].  This report was created prior to the murder, and does not appear to be relevant.

The second report, dated December 6, 1978, was written by Sergeant Richard McKenna, and also reflects a phone call from "E" in which she again names various drug dealers and says that she overheard Stymus, New, and Chris Kuen talking about a guy named "J.T." in Ventura.  She gave an accurate physical description of J.T. and provided his phone number.  "E" reported that J.T. was killed with his hands tied behind his back.  "E" also said, "I don't mind these people dealing, but when they kill someone, that is something else." [EH Ex. 6].

The third report is dated April 23, 1979.  It was written by McCoy, mentions three sisters, "B," "E," and "C," and indicates that Stymus may be contacted through Robertson. [EH Ex. 7].  McCoy wrote that Officer Danny Lott (who received the anonymous call reflected in the October 23, 1978 report) thought that the call was strange because his office had just been moved and the telephones had only recently been installed, yet the caller had the number and asked for him by name.  McCoy called Robertson to ask about the names provided by "E." Robertson said that the individuals listed were "the nucleus of a very large cocaine ring," and that he had represented "E" in a matter in the past.  Stymus was a friend of J.T.'s and Robertson had requested that Stymus find out if J.T.'s death was related to dope.  Stymus reported back to Robertson that "this situation was not related to narcotics." Robertson opined that someone "may have overheard a discussion relating to inquiries about the death."

Robertson later arranged a meeting between McCoy and Stymus, at

which Robertson was present. Stymus denied being at a meeting discussing J.T., but admitted that he did make inquiries through another person. He said he would not meet with New and Kuen because he was "on a different level from them." McCoy wrote that he had contacted the Los Angeles investigators (McKenna and Lott) and indicated that he considered their report "discoverable." He also told Robertson and Stymus the same thing. Further, McCoy stated that "if this information fits any defense theory, I feel an obligation to report that I have been advised, specifically by Robertson and vaguely by Stymus, that contact and subpoenas by the defense or myself with Larry New and Chris Kuen will create a 'blood bath' and result in death to any suspected informant. Rather these persons should be approached with caution or with prior notification." [EH Ex. 7].

On April 27, 1979, McCoy wrote a follow-up report indicating that he had received a phone call from "E" on April 26, 1979 and that the conversation was recorded. "E" claimed that she had not been the caller in the previous calls to police. "E" told McCoy that her sister "B" had a "snitch jacket," but that "B" would not have had the information which the caller gave to the officers. [EH Ex. 8]. On May 9, 1979, McCoy wrote another follow-up report, indicating that the first anonymous caller was the sister of "E." [EH Ex. 9].

On June 28, 1979, an in-camera hearing was held regarding this "fourteen page report."[25]  Again, petitioner and his counsel were excluded. The prosecutor stipulated that both the eight page and the fourteen page report were relevant. [EH Ex. 10 at 3]. The prosecutor

---

[25]  Respondent complains about petitioner's labeling several different reports as the "fourteen page report." However, the trial court referred to the reports in the same fashion as petitioner does. [EH Ex. 10 at 78].

argued that the conversation "E" overheard must have been different than she believed it to be (that is, that it actually was a conversation inquiring about the murder, and the fact that details about the murder were known was because Robertson had divulged the details to others and then instructed them to inquire about J.T.'s murder). [EH Ex. 10 at 4-10].[26]

Robertson and McCoy testified during the June 28, 1979 in camera hearing. According to Robertson, he contacted Stymus (after J.T. was missing but before Robertson knew that J.T. was dead) because Stymus had Robertson "on retainer" and had a large number of contacts in the high "echelons" of cocaine distribution. Robertson wanted to find out why J.T. had been killed and whether it was related to narcotics. He explained that he simply wanted "to clarify this for my own mind." On November 13, 1978, Robertson went to identify J.T.'s body. At that time, he learned from McCoy that J.T. had been shot with his hands tied behind his back with adhesive tape. [EH Ex. 10 at 11-14].

McCoy thought the phone call reflected in the December 6, 1978 report was important because the information about J.T.'s hands having been taped behind his back was not public, so the fact that "E" had overheard people discussing that fact was significant. Robertson informed McCoy that he had told Stymus about the tape and "apparently he imparted it to these other two people mentioned in the report." Robertson essentially argued to the trial court that the conversation did not suggest that the three people discussing the murder actually

---

[26]   It is not, however, the prosecutor's prerogative to evaluate the credibility of a piece of evidence for the purposes of determining whether it must be disclosed under Brady. As one court has pointed out, to allow the prosecutor to do so would be to "appoint the fox as henhouse guard."  DiSimone v. Philips, 461 F.3d 181, 195 (2d Cir. 2006).

committed it, but rather they were discussing the murder in an effort to "solve" it at Robertson's request. [EH Ex. 10 at 17-19].  Stymus told Robertson that narcotics were not involved in J.T.'s death, and Robertson passed this information on to McCoy to help his investigation. [EH Ex. 10 at 19].

Robertson further testified that he represented "E" (who purportedly knew all of the members of the cocaine "ring"), and that one of "E"'s sisters was an informant against "E."  According to Robertson, Stymus, New, and Kuen had learned that "E"'s sister had called the police with the information contained in the report, and that "those three girls will cease to exist if this information gets outside of this room...." [EH Ex. 10 at 23-24].  Robertson claimed that he "had to intervene in ["E"'s] behalf to keep her from being killed because of – because of – just the information that there is a report, not that anybody's seen it, but that somebody was upset enough about it that they wanted to – they wanted to have her killed."  The danger, he asserted, "stemmed from Mexican Mafia" because they thought they might be mentioned in the report. [EH Ex. 10 at 24-25]. Robertson said that the sisters would be killed by one of several different factions, "it's just a question of who would get there first.  I don't know whether it would be the Mexicans who would go absolutely crazy over it, and they have already stated that that is what would happen if – you know, if it tuned out that they – they got into any trouble over this report, that ["E"] and her sisters were gone, along with her parents or grandparents and everyone else.... Mr. Stymus is requesting, through me, and I am requesting that his report simply be buried somewhere because of the fact that the problems it's going to cause and, in my opinion, this has nothing to do with the defense in this case." [EH EX.

10 at 26-28].  Robertson claimed that there was a "hit list" with 34
names on it, suggesting that 34 people would be murdered if subpoenas
were issued for the people listed in the report.  When asked about who
had made such a list, Robertson said, "[l]et's just say from some very
wealthy cocaine organizations and traffickers," but he would not say
more than that. [EH Ex. 10 at 20].  The "hit list" included all of the
people named in the police report.  Robertson opined that the police
had fabricated the report "to get high echelon cocaine dealers to start
killing themselves in a frustrated effort to get at them." [EH Ex. 10
at 33-34].

The trial court ruled that the evidence of the telephone calls
from the sisters was admissible, and that speculation about a threat
to safety was not a reason to deny petitioner discovery. [EH Ex. 11].

Finally, on April 1, 1980 – more than a year after Judge Soares
directed the prosecutor to disclose "A"'s allegation that Bischoff had
called him with details of the murder, and nine months after Judge
Ruffner concluded that the phone calls from the sister should be
disclosed – Judge Stone sealed both the eight page and the fourteen
page report.  While Judge Stone noted that Judge Ruffner had "ordered
unsealed the two sealed packages," he did not provide any explanation
for the order "re-sealing" them.  [EH Ex. 13].

**Reasonable Likelihood of a Different Outcome**

In conducting the prejudice inquiry, the Court may find a
reasonable probability of a different result "without finding that the
outcome would more likely than not have been different." <u>Valdovinos</u>,

598 F.3d at 579 (quoting <u>Jackson</u>, 513 F.3d at 1071).  Instead, the
question is whether, in light of the suppressed evidence, petitioner

41

"received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Valdovinos, 598 F.3d at 579 (quoting Jackson, 513 F.3d at 1079) (quotation and citation omitted).

As recognized by the police, the prosecutor, and the trial court, the evidence contained in each of the foregoing police reports was relevant and favorable to petitioner.  The fact that the physical reports themselves were sealed does not affect this conclusion, and the prosecution cannot hide behind those rulings. See United States v. Rodriquez, 496 F.3d 221, 226 (2nd Cir. 2007) ("The obligation to disclose information covered by the Brady and Giglio rules exists without regard to whether that information has been recorded in tangible form."). As the trial court made clear from the outset, its orders were intended to avoid disclosure of the reports themselves, while still requiring the prosecution to provide the information contained within the reports to the defense.

Likewise, respondent's objection that the reports themselves might not be admissible is of no consequence.  The admissibility of the reports themselves is unnecessary; it is the information contained in the reports that was relevant.  Furthermore, that information was either admissible evidence or would have led to admissible evidence. Specifically, if petitioner's counsel had been aware of the information, he could have called "A" and the sisters as witnesses. Their prior statements would have been admissible both to impeach Bischoff and other prosecution witnesses, and to show that "A" and others knew facts that only a person involved in the murder would know. California law makes admissible the prior inconsistent statement of a witness not only to impeach credibility but also to prove the truth of the matters stated. See People v. Hovarter, 44 Cal.4th 983, 1008-1009

(2008).  If necessary, the prior statements could have been presented through the testimony of the police officers who received the telephone calls and recorded what the callers said about the murder.  See Cal.Evid Code §§ 780, 1202, 1235. As the Ninth Circuit has explained, "evidence can be 'used to impeach' a witness even if the evidence is not itself admissible, even to impeach." Paradis, 240 F.3d at 1179 & n. 5 ("For example, if Haws' notes record Elliott's hearsay reports of Dr. Brady's hearsay statements, then the notes themselves would not be admissible, even to impeach Dr. Brady. But if Dr. Brady's hearsay statements, reflected in the notes, contradict his in-court testimony, then the notes could be used to impeach Dr. Brady by leading the defense team to call Elliott to testify regarding Dr. Brady's prior inconsistent statements, which, as such, would not be hearsay."); see also Valdovinos, 598 F.3d at 578 (finding evidence material under Brady even where, due to its late disclosure, it was "unauthenticated and unreliable," explaining that "[n]onetheless, the letter could have been of some value to the defense, particularly if disclosed at the time police received it. Given the conflicting identification testimony and a letter pointing to another culprit, the nondisclosure of the letter denied the defense important investigative opportunities that had the potential to lead to admissible evidence.").

The suppressed evidence indicated that another individual may have been responsible for the murder.  "A" contacted the police around the same time that petitioner was arrested on unrelated charges.  He possessed non-public information concerning the murder, including the fact that J.T.'s hands were tied behind his back, and he claimed that he had learned this information from Bischoff, who denied ever calling "A."  When he testified at the in camera hearing, however, "A" claimed

that the reporting officer must have misconstrued or embellished his statements.  "A" also had a motive to kill J.T. - that is, J.T. had been skimming money that belonged to "A," and "A" likely knew about it.

As petitioner contends, if the reports or the information contained in the reports had been disclosed, the defense would have shifted its focus to "A."  At the evidentiary hearing, petitioner's trial counsel, Thomas Weems,[27] testified that if he had known the information contained in the reports but suppressed by the prosecution, he would have interviewed "A" and Smith.  [EHT at 86-92].  Weems also would have focused on "A" as possibly being involved in J.T.'s murder. Weems would have tried to show that Bischoff never called "A," and that "A" had a motive to kill J.T. and appeared to be framing petitioner. [EHT 126-130].

Alternatively, Weems could have called "A" and Smith in order to impeach Bischoff by showing that she had called "A" and told him a version of events that contradicted the version she later told the police and testified to.  [EHT at 86-92, 121-122].

In addition, if Weems had been privy to the sealed in camera hearings, he would have possessed additional support for his theory that Robertson was biased against petitioner and protecting people. [EHT 92-94].  Robertson's testimony at the in camera hearing may have been admissible to impeach him and to demonstrate his personal interest in the case.  The fact that Robertson fervently argued that evidence favorable to petitioner should be "buried" suggests a bias against petitioner, and could be used to argue that Robertson was involved, or knew the people who were involved, in the murder, and that he was

---

[27]  Weems was disbarred in 2007. [EHT 114].

acting to protect himself or others.  Cal.Evid. Code §§ 770, 1235.

Weems testified that if he had known about them, he would have used Robertson's statements during the in camera hearings to show that Robertson – who admittedly represented people named in the reports – did everything in his power to have the reports suppressed.  As Weems put it, Robertson kept pointing his finger toward petitioner and away from his friends and clients.  [EHT 94-101].  Also, if he would have had Robertson's testimony before Judge Ruffner that J.T. only dabbled in drugs, he could have used that to undercut Robertson's allegation that he asked high echelon drug traffickers to investigate whether J.T.'s death was related to the drug trade. [EHT 103-104].

Finally, Weems said that if he had been aware of the reports and the transcripts of the in camera hearings, he would have interviewed Officer Marsden, Stymus, Kuen, New, "E"'s sister, and Robertson.  Even if every one of the witnesses had refused to speak with him, Weems explained that his trial strategy would have been substantially different because there would have been enough information in the transcripts alone to make some very solid points on petitioner's behalf. [EHT 94-101, 105].

As petitioner contends, if the reports (or information contained in the reports) had been disclosed, the defense would have shifted its focus to "A."  After Bischoff testified as she did, the defense would have called "A" as a witness.  "A" would (presumably) testify consistent with the eight-page report.  Petitioner then would have re-called Bischoff to deny ever calling "A."  Petitioner could then argue to the jury, "how could A know about the crime?", and that "A" must have had a hand in J.T.'s death.  The defense then would have pointed out that "A" had a motive to kill J.T. (J.T. was skimming large amounts

of cash from the swap meets, essentially stealing from "A") and that "A" had a motive to call the police with information leading the investigation away from him, despite the fact that doing so allegedly posed great personal risk to him and his family from the biker community. [Petitioner's Post-Hearing Brief on the Merits at 21-23]. See United States v. Jernigan, 492 F.3d 1050, 1055-1057 (9th Cir. 2007) (finding a Brady violation warranting reversal where the prosecution failed to disclose evidence that two area banks were robbed by another woman bearing a resemblance to the defendant while the defendant was incarcerated awaiting trial on charges of bank robbery and noting that by suppressing this evidence, "the prosecution arrogated to itself a central function belonging to the criminal jury and pursued its role as adversary to the exclusion of its role as architect of a just trial"); Trammell v. McKune, 485 F.3d 546 (10th Cir. 2007) (finding that evidence suggesting that another individual was responsible for the charged crimes was "material" under Brady).

In addition to supporting a theory that "A" was the murderer, the evidence of the phone call from "A" could have provided petitioner's counsel with a basis for arguing that Bischoff had called "A" with facts about the murder that only the killer could have known, suggesting that Bischoff herself was involved in the murder. This theory would have been consistent with other important evidence, including Bischoff's possession of J.T.'s belongings, her belief that J.T. owed her a substantial sum of money, and her flight from the Los Angeles area after she learned that the police were interested in speaking with her. The telephone calls to the police from "E" and her sisters also would have lent support to either theory because they indicated that petitioner was being framed. In addition, the unusual

behavior of Robertson, a witness with a bias who became intimately involved in the case, who coaxed Bischoff to return to Los Angeles by purchasing a first class ticket and then coached Bischoff prior to and during her interview with the police, and who forcefully advocated and testified in favor of suppressing the material evidence, could have been used to show that he was somehow involved or protecting others who were involved in J.T.'s murder.

Considering the cumulative effect of the undisclosed evidence and the arguments it would have supported at petitioner's trial, there is a reasonable likelihood of a different outcome if the evidence had been disclosed to the defense.  The case against petitioner was far from overwhelming.  It was entirely circumstantial.  The murder weapon was not linked to petitioner, there was no blood in petitioner's van, and his behavior – appearing at J.T.'s house the night after the murder and hanging out there for an hour or more while Bischoff gathered her belongings – was not the behavior of a person who had just murdered an occupant of the house.  Petitioner provided a plausible alibi defense, and numerous people testified that they saw petitioner working in the garage of Dewitt's house at the time of the murder.  On the other hand, the prosecution's star witness – the only one who testified that petitioner was away from the house during the time of the murder and the only one who suggested a motive for petitioner to murder J.T. – was a heavy drug user who was smoking PCP before, during, and after the time of the murder, was high during at least part of her testimony,[28]

---

[28]   At one point during Bischoff's testimony, the trial court called a recess based upon Bischoff's demeanor.  Upon inquiry, Bischoff admitted that she had smoked marijuana and taken amphetamines before coming to the courthouse.  [RT 1606-1609].  The trial court expressed concern about Bischoff's ability to respond accurately and adequately to questioning, noting that it observed

1 was impeached with inconsistent statements and mental health problems,

2 and had received immunity.

3     As the Supreme Court observed in <u>Brady</u>, "[s]ociety wins not only

4 when the guilty are convicted but when criminal trials are fair; our

5 system of the administration of justice suffers when any accused is

6 treated unfairly." <u>Brady</u>, 373 U.S. at 87. Petitioner was subjected to

7 a trial in which secret hearings about relevant exculpatory evidence

8 were held.   The prosecution purposefully withheld from the defense

9 evidence favorable to petitioner, and harmful to the prosecution's

10 case.  During the secret hearings, the prosecutor relied on the police,

11 one of the prosecution's primary witnesses (Robertson), and a

12 confidential informant ("A") – all of whom possessed interests contrary

13 to those of the defense – to argue that this exculpatory evidence

14 should be suppressed.  The prosecution was so successful in violating

15 the trial court's orders and its constitutional obligation that by the

16 time the exculpatory evidence came to light – nearly three decades

17 later – many of the important witnesses had died or disappeared.

18 Permitting the prosecutor to engage in this sort of gamesmanship with

19 impunity signals that the constitutional rules established in <u>Brady</u> and

20 its progeny are merely "pretend rules" that need not be taken

21 seriously. <u>See</u> <u>United States v. Antonelli Fireworks Co.</u>, 155 F.2d 631,

22 661 (2d Cir.) (Frank, J., dissenting) (stating that when courts do no

23 enforce rules regulating prosecutorial misconduct, prosecutors view

24

25 her to be under the influence, and particularly that she was
"slurring badly." [RT 1622-1623].   The trial court then informed

26 the jury that Bischoff had been under the influence of marijuana
and diet pills during her morning testimony.   [RT 1626-1627].

27 After a break, and the trial court's determination that Bischoff
was competent to continue testifying, Bischoff resumed her

28 testimony. [RT 1641-1650].

them as "pretend rules"), <u>cert. denied</u>, 329 U.S. 742 (1946); Gershman, <u>Litigating Brady v. Maryland: Games Prosecutors Play</u>, 57 Case W. Res. L. Rev at 549 (noting that prosecutors are encouraged to "play and frequently beat the odds that their suppression of evidence, even if discovered, will be found immaterial by a court").

In sum, respondent does not dispute the conclusion of the trial court, the prosecutor, or the police that the evidence was relevant, exculpatory, and should have been disclosed to the defense. Nor does respondent contend that the prosecution fulfilled its obligation to disclose this evidence. Further, for the reasons set forth above, there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. See <u>Kyles</u>, 514 U.S. at 433-434; <u>Bagley</u>, 473 U.S. at 682. Stated differently, taken together, the evidence suppressed by the prosecution could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. <u>Cone</u>, 129 S.Ct. at 1782-1783; <u>see</u>, <u>e.g.</u> <u>Valdovinos</u>, 598 F.3d at 590 (granting relief on <u>Brady</u> violation, finding "the cumulative effect of the suppressed evidence denied Valdovinos a fair trial. The prosecution's repeated failure to disclose evidence favorable to the defense leads us to conclude that Valdovinos did not receive a fair trial resulting in a verdict worthy of confidence, even where some of th suppressed evidence was inadmissible); <u>Horton v. Mayle</u>, 408 F.3d 570, 578-582 (9th Cir. 2005) (stating that habeas relief was warranted where the prosecution failed to disclose a promise of immunity given to its "star witness" in exchange for his testimony, "testimony that provided the only evidence of a motive and the opportunity to kill the victim and that included a confession by [the petitioner] himself," and holding that

the prosecution's suppression of such a promise "undermines confidence in the outcome of the trial"). The contrary conclusion of the state courts was an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1); Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). Accordingly, petitioner is entitled to relief on the basis of this claim.

### Conclusion

It is recommended that the petition for a writ of habeas corpus be granted and that respondent be directed to release petitioner from custody unless the State of California provides petitioner with a new trial within sixty (60) days from the date of entry of judgment.

Dated: October 22, 2010

Andrew J. Wistrich
United States Magistrate Judge

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MICHAEL RAY HANLINE, | ) |
| Petitioner, | )Case No. EDCV 00-530-VAP(AJW) |
| v. | )[PROPOSED] )JUDGMENT |
| GEORGE GALAZA, WARDEN, and ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, | ) ) ) |
| Respondents. | ) ) |

    **It is hereby adjudged** that the petition for a writ of habeas corpus is granted, and respondent is directed to release petitioner from custody unless the State of California provides petitioner with a new trial within sixty (60) days of the date of entry of judgment.

Dated: _____

_____
Virginia A. Phillips
United States District Judge