**JAN STIGLITZ**
State Bar No. 103815
**JUSTIN BROOKS**
State Bar No. 214187
**MARIO G. CONTE**
State Bar No. 93211
**ALEXANDER SIMPSON**
State Bar No. 235533
**CALIFORNIA INNOCENCE PROJECT**
225 Cedar St.
San Diego, CA 92101
Telephone: (619) 515-1525
Facsimile: (619) 615-1425

Attorneys for Petitioner
**MICHAEL RAY HANLINE**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL RAY HANLINE**, ) | Case. no. EDCV 00-530-VAP (AJW) |
| Petitioner, ) | **MOTION FOR RELEASE** |
| ) | **PENDING DISPOSITION OF 18** |
| vs. ) | **U.S.C. SECTION 2254 PETITION** |
| ) | |
| **GEORGE GALAZA**, ) | |
| ) | |
| Respondent. ) | |

Petitioner, by and through his attorneys Jan Stiglitz, Justin Brooks, Mario Conte, and Alexander Simpson, of the California Innocence Project, hereby moves for an Order directing the California Department of Corrections to release Petitioner on bail pending the final disposition of the pending Petition for a Writ of Habeas Corpus. The grounds for this Motion are as follows:

### INTRODUCTION AND OVERVIEW

At the time this Motion is filed, Petitioner will have been incarcerated for thirty-one years for a crime that he did not commit. He has made as strong an evidentiary showing of actual innocence as this or any other court is likely

1   to entertain, as illustrated by multiple examples of *Brady* violations, as well as

2   numerous instances of ineffective assistance of counsel previously presented in the

3   Petitioner's habeas corpus Petition to this Court.

4       On October 22, 2010, United States Magistrate Judge Andrew J. Wistrich

5   issued a Report and Recommendation recommending that Petitioner's pending

6   Petition for Writ of Habeas Corpus be granted.  Three months later, on January 21,

7   2011, Respondent filed its objections to the Magistrate Judge's Report and

8   Recommendation.  Thereafter, on February 14, 2011, Petitioner filed its Response to

9   the objections to the Report and Recommendation.  Today, more than eight months

10  after Magistrate Judge Wistrich recommended that Petitioner's Petition for Writ of

11  Habeas Corpus be granted, and more than four months after the Court received full

12  briefing on the Report and Recommendation, Petitioner still awaits a final disposition

13  on the pending habeas Petition.

14      Petitioner appreciates that this Court is conducting a thorough review of the

15  trial record, the habeas corpus hearing, and the applicable law. At the same time,

16  Petitioner seeks release for several reasons, primarily due to the severe deterioration

17  of his health over the course of a thirty-one-year period of wrongful incarceration.

18  Petitioner has endured numerous invasive surgeries, ensuing complications, and other

19  ailments. The treatment provided by the California Department of Corrections has

20  been unsuccessful and Petitioner's health continues to deteriorate.  As will be shown,

21  Petitioner's health means that he is not a flight risk and is not a threat to public safety

22  if he is released pending the Court's decision.  Accordingly, Petitioner seeks bail to

23  obtain desperately needed medical treatment and to improve his health.

24

25

26

## LEGAL STANDARDS FOR GRANTING BAIL PENDING

## ADJUDICATION OF A 28 U.S.C. SECTION 2254 PROCEEDING

Federal case law has long recognized the inherent authority of a federal district court to grant bail to a state petitioner during the course of the pursuit of relief under 28 U.S.C. section 2254.  More than four decades ago, the United States Supreme Court recognized the right to bail during a federal habeas corpus proceeding upon an appropriate showing.  In *Shuttlesworth*, the Supreme Court issued a per curiam order that a state habeas corpus petitioner "may, upon appropriate showing, proceed on this application in the United States District Court, which may then consider all state remedies exhausted and proceed to hear and determine the cause, including any application for bail, pending that court's final disposition of the matter." *In re Shuttlesworth*, 369 U.S. 35, 35 (1962).  In *Hensley*, the Supreme Court, citing *Shuttlesworth*, concluded that a California habeas petitioner was "in custody" for purposes of standing to pursue federal habeas corpus relief, and confirmed the authority of the district court to grant bail while considering the petition:

> Moreover, our conclusion that the petitioner is presently in custody does not interfere with any significant interest of the State. Indeed, even if we were to accept respondent's argument that petitioner is not in custody, that result would do no more than postpone this habeas corpus action until petitioner had begun service of his sentence. It would still remain open to the District Court to order petitioner's release pending consideration of his habeas corpus claim. *In re Shuttlesworth*, 369 U.S. 35, 82 S. Ct. 551, 7 L. Ed. 2d 548 (1962). Even if petitioner remained in jail only long enough to have his petition filed in the District Court, his release by order of the District Court would not jeopardize his "custody" for purposes of a habeas corpus action.

*Hensley v. Municipal Court, San Jose-Milpitas Judicial District*, 411 U.S. 345, 352 (1973).

The Ninth Circuit has confirmed "the authority of a federal court to grant bail to a state prisoner prior to ruling on the prisoner's petition for habeas corpus." *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3rd Cir. 1992).  The court referred to *Shuttlesworth* for the proposition that "[i]n spite of the lack of specific statutory

3

1  authorization, it is within the inherent power of a District Court of the United States
2  to enlarge a state prisoner on bond pending hearing and decision on his application
3  for writ of habeas corpus." *Id*.

4       Federal courts addressing this issue have recognized that granting bail to a state
5  petitioner is neither a matter of right nor a frequently granted privilege, but requires
6  the type of unusual showing that exists in this case.  The Third Circuit has adopted
7  the approach that bail pending section 2254 disposition is warranted upon showing:
8  1) a high likelihood of success on the merits; 2) some other "exceptional
9  circumstances," such as (but not limited to) medical exigency, ineffectiveness of
10  habeas corpus remedy unless bail is granted, or other hardship; and 3) a clear showing
11  of exhaustion of state remedies as to the constitutional claims. *Lucas v. Hadden*, 790
12  F.2d 365, 367 (3rd Cir. 1986).

13       The Fifth Circuit has adopted a similar approach, *Calley v. Callaway*, 496 F.2d
14  701, 702 (5th Cir. 1974), as has the Eighth Circuit, *Martin v. Solem*, 801 F.2d 324,
15  330 (8th Cir. 1996) ["Release on bail pending disposition of the habeas
16  petition...requires the habeas petitioner to show not only a substantial federal
17  constitutional claim that 'presents not merely a clear case on the law, but clear, and
18  readily evident, case on the facts...[and] also existence of "some circumstance making
19  [the request] exceptional and deserving of a special treatment in the interest of
20  justice."'"]

21       The Ninth Circuit stated in *Land v. Deeds*, 878 F.2d 318, 319 (9th Cir. 1989),
22  that "[b]ail pending a decision in a habeas case is reserved for extraordinary cases
23  involving special circumstances or a high probability of success." *In re Roe*, 257 F.3d
24  1077 (9th Cir. 2001), the court reviewed the issue as one of first impression, reviewed
25  the authority from other circuits, and did not decide the question because
26  "[a]ssuming, arguendo, that a district court has the authority to release a state prisoner

4

on bail pending resolution of habeas proceedings in extraordinary cases, the district court clearly erred in releasing Nickerson under the circumstances of this case." *Id*. at 1080.

In *Roe*, the court denied the petitioner's motion for bail on four grounds: 1) the seriousness of the constitutional violations the petitioner alleged did not justify release on bail; 2) the sole evidence of the petitioner's actual innocence were statements made by one of the petitioner's co-defendants to his former counsel asserting that the petitioner had nothing to do with the crime; 3) counsel's representations regarding the petitioner's failing health and need for medical attention would be relevant only if the required treatment was unavailable to him through the California Department of Corrections; and 4) the district court never found the State to be in violation of any discovery order. *Id.* The court in *Roe* further explained that the district court's grant of bail may be warranted in an "extraordinary case[] involving special circumstances or a high probability of success," *Id*, citing *Land v. Deeds*, *supra*, 878 F.2d at 318.

Petitioner's showing here is far more substantial and meets or exceeds any rational test for release on bail. Unlike *Roe*, Petitioner has suffered possibly the most egregious violation of his Constitutional rights: the withholding of exculpatory material for almost thirty years in violation of *Brady*. Second, unlike *Roe*, where the petitioner relied on exculpating statements made by his co-defendant, here, Petitioner has made as strong an evidentiary showing of actual innocence as this or any other court is likely to entertain. Petitioner's claim is supported by multiple examples of *Brady* violations. The fact that this Court has before it a Report and Recommendation recommending that Petitioner's conviction be reversed shows both how egregious the violations are and how strong the presented evidence is. Further, where in *Roe* the court found that the State did not violate any discovery orders, here, this Court has

5

tentatively found that the State actually sealed exculpatory police reports for close to three decades. These police reports have been unsealed in accordance with this Court's order and have been subsequently used in Petitioner's habeas corpus petition to this Court.

Lastly, Petitioner's circumstances clearly show that his deteriorating health and extensive medical needs present a problem that the California Department of Corrections cannot meet.

## THE CIRCUMSTANCES WARRANTING CONTINUED BAIL IN PETITIONER'S CASE

## I. The Exceptional Circumstances Warranting Bail in the Interests of Justice

### A. Nerve Damage

Since Petitioner's last Motion for Bail in 2010 (Exhibit A, Notice of Motion and Motion for Bail Pending Disposition of 18 U.S.C. Section 2254 Petition,) Petitioner has continued to suffer from severe back pain. Nurses from the California Department of Corrections have consulted with Petitioner about his lower back pain on multiple occasions. On August 17, 2010, Nurse Thornton reported that Petitioner was suffering from sharp, stabbing lower back pain down both legs and experiencing numbness in his hands. (Exhibit B, CDCR Encounter Form: Musculoskeletal Complaint.) Thereafter, on September 1, 2010, Dr. Peter Perez evaluated Petitioner's chronic lower back pain and documented that Petitioner suffers from spondylosis, a degenerative joint disease where adjacent vertebrae compress together, causing an increase in the amount of pressure on the spinal column and nerves. (Exhibit B, Primary Care Provider Progress Note; Declaration of Sarah E. Jordan, hereinafter referred to as "Exhibit C.") Despite the additional medication Dr. Perez prescribed, Petitioner's pain persisted. Nurse Thornton reassessed Petitioner's pain on two more occasions, once on September 7, 2010, and again on September 14, 2010. On both

occasions, Nurse Thornton documented that Petitioner suffered from severe lower back pain, additional musculoskeletal discomfort, including muscle spasms, numbness in legs, and pain described as "liquid fire" down his legs. (*Id.*) (Exhibit B, CDCR Encounter Form: Musculoskeletal Complaint, p. A-1.)

On October 8, 2010, almost two months after Petitioner's August 14, 2010 request for medical services, Dr. Mack requested that Petitioner receive outpatient care. Dr. Mack specifically requested that Petitioner undergo an electromyography exam (EMG), a neurologic testing procedure used to diagnose nerve and muscle dysfunction and spinal cord disease. (Exhibit B.) Thereafter, on December 14, 2010, Doctor White, a neuropsychologist at Rehabilitation Management Systems, Inc. conducted various nerve conduction studies to evaluate Petitioner's nerve functioning of the lower extremities. (Exhibit B.) Based on the test results, Dr. White concluded this was an abnormal study. (Exhibit B.) First, "significant electrophysiological evidence was recorded suggestive of a **chronic lumbosacral radiculopathic process** involving the **S1 nerve roots on the left.**" (Exhibit B, emphasis in original.) Second, "significant electrophysiologic evidence was recorded suggestive of a **MILD TO MODERATE demyelinating and axonal polyneuropathic process involving both sensory and motor nerve fibers** of the **bilateral upper and lower extremities**." (Exhibit B, emphasis in original)

The results of the December 14, 2010 EMG reveal that Petitioner suffers from a serious, relentless degenerative condition that threatens his mobility and general neurological functioning. (Exhibit C.) Similar to the trend seen from 2010 to 2011, this pain can only be expected to increase, as Petitioner also suffers from mild to moderate demyelinating of various nerve fibers, a condition that impairs the ability of nerves to conduct electrical impulses. (Exhibit C.)

The December 14, 2010 EMG results are the most recent documentation of

7

Petitioner's well-established, degenerative neurological condition that continues to impair Petitioner's mobility and strength, and they demonstrate: (1) the lack of danger Petitioner would pose to the community if released, and (2) that Petitioner is not a flight risk. Since 2004, Doctors from the Department of Corrections have completed numerous Comprehensive Accommodation Chronos documenting the accommodations Petitioner requires due to his multiple medical conditions. (Exhibit D.) Petitioner requires health care appliances (a cane and a walker); special housing accommodations, including ground floor cell and bottom bunk, both of which are required to ensure that he does not have to climb stairs or up into a bunk. From 2006 on, doctors' orders have included no lifting more than five pounds, pushing, pulling, and prolonged walking or standing. (Exhibit E.)

The severity of Petitioner's medical state became even clearer on July 25, 2008, when  Dr. S. Lopez completed a Disability Placement Program (DPP) Verification Form and a filed a Health Services Chrono. (Exhibit F.)  Petitioner was removed from his former DPP code, DNM (Mobility Impairment- walks 100 yards without pause or without assistive devices) to DPM (Mobility Impairment- cannot walk 100 yards on a level surface without pause).  Petitioner's inability to walk 100 yards on a level surface without pause makes it extremely unlikely Petitioner qualifies as a flight risk.   Petitioner has reported that "the pain in [his] lower back is becoming unbearable its [sic.] getting so bad [he's] not sleeping and [is] losing what little mobility [he] had." (Exhibit G.)  Petitioner gets up and walks slowly.  Due to his weak state, it is highly unlikely that Petitioner could be capable of inflicting any danger on the community. Petitioner's increasingly impaired mobility demonstrates that he is even less of a flight risk than he was in 2010.

### B.  Mesh Repair

Prior to 2010, Petitioner experienced severe gastrointestinal problems and

8

1   underwent "numerous abdominal surgeries for recurrent bowel obstructions with

2   small and large bowel resections." (Exhibit H; see also Exhibit A.)  Petitioner still

3   suffers from the side effects of his multiple abdominal surgeries, and in March of

4   2010, Dr. C.K. Chen from the California Department of Corrections Treatment Center

5   requested that Petitioner undergo an outpatient consultation for a herniorrhaphy, a

6   surgical procedure used to correct a hernia.   Doctor Chen indicated Petitioner's

7   history of small bowel obstructions and an increase in the size of the bulge in the

8   incision area made this a medical necessity.  Doctor Roland Rodriguez agreed with

9   Dr. Chen's recommendation, and, after examining Petitioner at Mercy Hospital, Dr.

10  Rodriguez diagnosed Petitioner with an incisional ventral wall hernia, a type of hernia

11  that: (1) allows a protrusion of the intestine through the abdominal wall, and (2)

12  occurs when an abdominal incision fails to heal correctly or separates because of

13  abdominal strain.  Dr. Rodriguez concluded that Petitioner "should undergo repair of

14  the ventral wall hernia with mesh." (Exhibit H.)  "Besides the fact that the patient has

15  ongoing severe abdominal pain as a result of this bulging mass and ventral wall

16  hernia, he faces the ongoing risk of incarceration and possible strangulation with all

17  of the attendant increased morbidity and mortality." (Exhibit H.)

18       On April 29, 2010, pursuant to Dr. Rodriguez's orders, Petitioner underwent

19  ventral hernia repair with mesh at Mercy Hospital.  (Exhibit H.)  During the surgery,

20  Dr. Rodrgiuez noticed "several hernias, each approximately the size of about 4cm,

21  one on the left side and two on the right side."  Dr. Rodriguez also noted that "the

22  fascia, in the midline also appears weak and there is a fascial defect right at the

23  umbilicus."   "All the defects were covered with a composite mesh in underlay

24  fashion."  Petitioner was discharged on May 5, 2010, with the following instructions,

25  "no lifting or strenuous exercise x4 weeks.  Follow up in 2-4 weeks as an outpatient

26  with Dr. Rodriguez."  (Exhibit H.)

9

After surgery, Petitioner required routine medical assistance for wound care, staple removal, and other check ups to follow up on Petitioner's status post-hernia repair.   On May 26, 2010, Nurse from Kern Valley State Prison filed an interdisciplinary progress note, indicating that  Petitioner should follow up with the Doctor within 14 days, follow up with the MD/RN as needed, take medications as directed, and notify staff immediately for redness, drainage, excess swelling, or fever. On May 26, 2010, Petitioner again met with Dr. Rodriguez at Mercy Hospital for status post hernia repair. (Exhibit H.)

As evinced by Dr. Rodriguez's notes, Petitioner's recent surgery, and subsequent check-ups, Petitioner's hernia problems are recurring. It is a constant condition, and Petitioner is constantly in need of supervision and maintenance on an outpatient basis.  Again, this means Petitioner is an unlikely flight risk, as he needs constant medical attention.

**C.  Recommendation for Further Surgery on Hernia**

Despite the 2010 hernia surgery, Petitioner has continued to suffer from abdominal issues.  On February 3, 2011, Doctor Edward Birdsong requested that Petitioner undergo outpatient surgery for his abdominal hernia  due to failure of previous mesh repair to the left abdominal wall. (Exhibit I.) Despite Dr. Birdsong's and Petitioner's request for medical attention to his hernia, Doctor Kumar denied Dr. Birdsong's  request, asking for clarification in regards to Petitioner's symptoms and whether there was incarceration.  (Exhibit I.)

Thereafter, on March 17, 2011, a licensed vocation nurse responded to Petitioner's complaints of abdominal pain and found Petitioner in his cell, "kneeling in front of his commode vomiting."  (Exhibit J.)  That same day, Petitioner was admitted to Natividad Medical Center's Medical-Surgical Unit for a small bowel obstruction. Dr. Angelica Salazar evaluated Petitioner and diagnosed Petitioner with

10

a small bowel obstruction.  Throughout a five-day, outpatient hospital stay, Petitioner: (1) received IV fluids; (2) underwent nasogastric intubation, a medical process which involves inserting a plastic tube through the nose, past the throat, and into the stomach; and (3) underwent NG tube suction to drain his stomach. (Exhibit J.)  With the outpatient medical treatment, Petitioner's condition improved, and immediate surgery was not required.  Dr. Salazar did, however, document elective hernia repair as an option.  Dr. Salazar noted that there was a bulging mass located at the left mid to lower mid quadrant.  Salazar also noted how Petitioner's coughing contributed to his hernia becoming aggravated.

As seen, Petitioner's abdominal problems are relentless.  The fact that this condition is in constant need of attention means Petitioner is not a flight risk because Petitioner cannot just up and leave.  As outlined in Dr. Salazar's notes, Petitioner's hernia defect is a condition that is in constant need of attention because something even as minor as bronchitis can result in an extremely significant medical emergency. Coughing causes abdominal strain and increases the pressure on the abdominal wall tissue and muscles, aggravating the hernia.  Coughing also increases the potential for more intestine or other tissue to further protrude through the abdominal wall, thereby increasing the potential risk of the organ getting stuck in the hole in the abdominal wall, losing blood supply, and becoming strangulated.

### D. Bronchitis

On November 30, 2010, an Emergency Medical Technician (EMT) responded to Petitioner's complaints of difficulty breathing.  (Exhibit K.)  Based on Petitioner's wheezing and labored respiratory breathing, the EMT administered oxygen and admitted Petitioner to Salinas Valley State Prison's Correctional Treatment Center (CTC).  Dr. Bridgnell diagnosed Petitioner with an "upper respiratory infection, probable bronchitis." (Exhibit K.)  Petitioner underwent a nebulizer treatment.  Dr.

Bridgnell prescribed albuterol as needed for shortness of breath and cough and Levaquin for probable bronchitis.

Petitioner's recent bronchitis diagnosis reveals that Petiotner's health is deteriorating. The doctors' notes show Petitioner is less of a flight risk than he was in 2010 because something as minor as bronchitis could result in an extremely significant medical emergency. Not only does Petitioner's current disabilities prevent Petitioner from fleeing, but Petitioner has no motivation to flee, as something as minor as bronchitis could result in an extremely significant medical emergency.

**E.  Additional Health Issues Demonstrating Petitioner's Deteriorating Health and Inability to Flee**

Petitioner's other health issues, recent dramatic weight loss, and lengthy list of medications further demonstrate Petitioner's deteriorating health. Petitioner suffers from hypothyroidism, hypertension, dyslipidemia, gastroesophageal reflux disease, and gastric ulcers, some of which exacerbate and aggravate Petitioner's other serious medical issues. (Exhibit J.)

On November 3, 2010, Nurse Thornton documented Petitioner's weight loss of thirty pounds in two months. (Exhibit L.)  Additionally, the nurse reported Petitioner had been throwing up blood and had blood in stool. Petitioner had rebound tenderness on palpatation to the abdomen.

Petitioner is currently prescribed over 7 medications. (Exhibit K, Medication Reconciliation- Active Medications as of 3/21/2011.)  Despite these medications, Petitioner's severe pain persists and his health continues to deteriorate at an increasingly alarming rate.  Since 2010, Petitioner has been admitted to outside facilities and hospitals on an outpatient basis on more than three occasions.  This reveals both the increasing intensity of his medical problems and that Petitioner presents the California Department of Corrections with medical challenges they

cannot meet.  The overwhelming purpose of Petitioner's plea for release on bail is to enable him to receive adequate medical treatment and live out the rest of his days in a setting more appropriate for a seventy-two year-old man.  (Exhibit M; Exhibit N.)

### CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that this Court grant Petitioner release pending the final disposition of this section 2254 proceeding, pursuant to a bail monitoring procedure satisfactory to this Court.

Respectfully submitted,

Dated: June 22, 2011                              /s/Alexander Simpson
                                                  ALEXANDER SIMPSON
                                                  Attorney for Petitioner
                                                  **MICHAEL RAY HANLINE**

13

1

## DECLARATION OF SERVICE

2

Case Name:      MICHAEL RAY HANLINE v. GEORGE GALAZA, WARDEN
Case No.:       EDCV 00-530-YAP (AJW)

3

I declare:

4

5   I am employed by the California Innocence Project, which is the office of a member
of the Bar of this Court at which member's direction this service is made. I am
6   eighteen years of age or older and not a party to the within entitled cause. I am
familiar with the business practice at the California Innocence Project for collection
7   and processing of correspondence for mailing with the United States Postal Service.
In accordance with that practice, correspondence placed in the internal mail collection
8   system at California Western School of Law, of which the California Innocence
Project is a part, is deposited within the United States Postal Service that same day
in the ordinary course of business.

9

On June 23, 2011, I placed a copy of the attached:

10

11  •       NOTICE OF MOTION AND MOTION FOR RELEASE PENDING
DISPOSITION OF 18 U.S.C. SECTION 2254 PETITION

12

13  and the attached exhibits in the internal mail collection system at California Western
School of Law, located at 225 Cedar St, San Diego, California, for deposit in the
14  United States Postal Service that same day in the ordinary course of business, in a
sealed envelope, postage thereon fully prepaid, addressed as follows:

15

16  KAMALA D. HARRIS
DANE R. GILLETTE
PAMELA C. HAMANAKA
17  XIOMARA COSTELLO
**RICHARD S. MOSKOWITZ**
18  Deputy Attorney General
300 South Spring Street, Suite 1702
19  Los Angeles, CA  90013

20  I declare under penalty of perjury the foregoing is true and correct and that this
declaration was executed on June 23, 2011 in San Diego, California.

21

22                                  /s/ Alexander Simpson
Alex Simpson

23

24

25

26

14